MANDRED STROUD v. JAMES M. SPRINGFIELD.

It is one of the fundamental rules of evidence, that all private writings must be proved to be genuine before they can be admitted as evidence.   One of the exceptions to this rule is where a deed is thirty years old, in which case it is presumed that proof of its execution by subscribing witnesses or otherwise is out of reach, and the deed is said to prove itself.   The principle underlying this exception seems applicable to all ancient writings which might be evidence of present rights.

But to the admissibility of an instrument as an ancient writing it is essential that it be free from suspicion, that it come from proper custody, and that it has been so acted on as to afford some corroborative proof of its genuineness.

Though it has been held that, to render a conveyance admissible as an ancient deed, there must be proof of possession under or referable to it, and running with it, yet the weight of authority seems to have established that, if such proof is not to be had, the deed may be read upon evidence of other circumstances corroborative of its genuineness.

What circumstances of corroboration are necessary to authenticate a writing offered as an ancient deed must greatly depend in every case upon the purpose and character of the instrument itself.   They must be auxiliary to the apparent antiquity of the deed, and be sufficient to raise a reasonable presumption of its genuineness.   In the case at bar, slight evidence tending to prove the handwriting to be that of the parties whose act the instrument purported to be would have sufficed.

When it appears that the party offering an instrument as an ancient writing could have examined witnesses who had had opportunities of acquiring a knowledge of the handwriting of the persons whose act the instrument purported to be, the omission of the party to endeavor to make proof of the handwriting by such witnesses is itself a circumstance which should excite suspicion of the genuineness of the instrument; and a suspicion arising in this manner is strengthened in a case where the instrument in question purported to be the act of public and prominent government officers, with whose handwriting many persons were likely to be acquainted.

The mere fact that the field-notes of a survey made in 1835 were found among the papers of a deceased person, who was at that time the surveyor

Syllabus.

of the land district, was not sufficient to authorize the admission of the field-notes in evidence, when it appeared that they had never been recognized or acted on either by the government or private parties.

When two documents are offered in evidence together and in connection with each other, and the rejection of one would render the other futile, it is not error, if one of them be inadmissible, to exclude them both.

On questions of boundaries, it seems that declarations of deceased persons who were in a situation to possess information on the subject, and who were not interested, are admissible in evidence, even when the declarations were not part of the original *res gesta*. At common law, such evidence was only admissible in cases involving questions of a general or public nature, but was not allowed for the purpose of establishing the boundaries of private estates. The tendency of American decisions has been to disregard this distinction, and to admit such evidence on questions of private as well as public boundaries. This tendency is the result of the necessity of resorting to this character of evidence, occasioned by the constant destruction of landmarks in this country, in consequence of the perishable nature of their materials and of the settlement and improvement of the lands, by reason of which it is indispensable in many cases that hearsay or reputation should be received to establish old boundaries. (Paschal's Dig., Art. 5294, Note 1144.)

The plaintiff, for the purpose of contradicting the statements of an adverse witness, offered in evidence certain affidavits purporting to have been made in 1838, and relating to surveys made previous to the closing of the land office by the consultation, (Paschal's Dig., Art. XIV, p. 27,) and, as a predicate for the introduction of such documents, the plaintiff proved the death of the persons and officers by and before whom the affidavits purported to have been made: *Held,* that the predicate was insufficient, and that the affidavits were properly excluded, no proof having been attempted of the handwriting of the instruments, of the custody whence they came, or of any other circumstance corroborative of their genuineness or antiquity.

Evidence of the execution of papers of many years' standing is not expected to be so direct or full as would otherwise be required. The law is indulgent in such cases, and does not demand that complete measure of proof which is required in recent transactions. Evidence, for instance, which, though inadmissible in respect to a recent transaction, is persuasive of the authenticity of an instrument, is freely admitted when the instrument is aged.

Common reputation or understanding in the neighborhood is admissible with regard to ancient boundaries, but it must be general and concurrent, and must have been formed before the commencement of the controversy in which it is used as evidence. Proof of such reputation therefore must have reference to a time *ante litem motam.* (Paschal's Dig., Art. 5294, Note 1144.)

In a suit respecting boundaries, a witness was asked, "whether or not the location of the Powell league, as represented on the map, had been uni-

formly and generally respected and accredited as the true location by the community around it?"   The question was objected to, and the objection was sustained: *Held*, that the ruling was correct, because the question as propounded was not limited to a period anterior to the commencement of the suit, and also because it seems to be directed more towards proving the correctness of the map than the locality of the boundaries of the survey on the ground.

Where one party, for the purpose of proving the locality of a survey as claimed by him, was permitted to introduce a sketch from the general land office map, it was not error to allow the adverse party to introduce in rebuttal patents from the general land office, in order to show thereby that the officers of the government regarded the map as incorrect in this particular.

In actions of trespass to try title, the claimant or plaintiff must not only prove the title under which he claims, but must also prove that the land described in his petition is the same possessed by the defendant, unless he is relieved from so proving by the pleadings or admissions of the defendants.

The plea of "not guilty" admits nothing, but puts in issue not only the title of the plaintiff, but also the possession of the defendant, and imposes on the plaintiff the necessity of proving everything requisite to sustain his right of action.   (Paschal's Dig., Art. 5307, Note 1152.)

The 6th section of the act of 5 February, 1840, (Paschal's Dig., Arts. 5297, Note 1145,) dispensing with proof of an actual trespass by the defendant, does not affect this question; that provision was simply designed to dispense with a formality not involving any right of a defendant, but was not intended to shift the burden of proof, or in any way to change the general principles of law governing the rights of the parties.

By the act of 5 February, 1840, (trespass to try title,) the common-law action of ejectment, with its fictions, was abolished, and the present form was instituted.   It was designed as a simple and direct mode of litigating and quieting titles in lands.   (Paschal's Dig., Art. 5292, Note 1142.)

As to what are boundaries, how they may be established and identified, and the rules which shall govern in ascertaining and deciding their locality, has been settled by repeated adjudications, with which we are satisfied. (Booth v. Upshur, 26 Tex., 64; Booth v. Strippleman, Id., 436, and the various cases collected in Paschal's Dig., Note 1144.)

In a case of conflicting evidence, in order to justify this court in setting aside a verdict on the ground that it is against the weight of evidence, it is not sufficient that the verdict does not clearly appear to be right; it must clearly appear to be wrong, else it will not be disturbed. (Paschal's Dig., Art. 1470, Note 566.)

See this case for an instance in which the court reviews the proofs, and is of opinion that the verdict is contrary to the weight of the evidence as disclosed in the record, but at the same time, in view of the conflict of testimony, declines to disturb the verdict or reverse the judgment, because there was some evidence to sustain it.

APPEAL from Falls. The case was tried before Hon. JOHN GREGG, one of the district judges.

Trespass to try title, brought by the appellant, on the 23d of September, 1858, against James M. Springfield and several other defendants, for the recovery of the southeast half of a league of land originally granted to Archibald Powell. The defendants plead "not guilty." There was no controversy about titles, it being admitted that the plaintiff's title to the "Powell league" was perfect; but the controversy turned altogether upon the true locality of the league, upon which depended the question, whether any portion of it were in possession of the defendants, or any of them. The title to Powell, under which the plaintiff claimed, was issued by the commissioner of the Nashville, or Robertson's colony, on the 3d of August, 1835, and recited that the land "was surveyed by the surveyor, J. Hadley, previously appointed for that purpose."

On the trial of the case, at the fall term, 1860, the plaintiff introduced a land-office translation of the original title to Powell, and rested his case upon it and the admission of the defendants that the chain of title from Powell to the plaintiff was regular and complete.

The defendants introduced W. S. Hunnicutt, a practical surveyor, who testified that he had searched for the Powell league, and who proceeded in his testimony to describe at length what he considered to be its metes and bounds, as found by him. According to his location of the tract, none of the defendants were in possession of any part of it.

Defendants also introduced William McCoy, whose testimony is adverted to in the opinion. He stated that he was one of the party who assisted the surveyor, Hadley, in the spring of 1835, to survey the Powell league; that he had recently, before the trial, gone over the ground, and had examined the lines as run out by the witness, Hunnicutt, and was satisfied that Hunnicutt's survey was

the true location of the league. He stated that the original survey by Hadley was made for Powell in April or May, 1835, and narrated sundry incidents which transpired while it was being made, and, among others, that he had cut a limb from a willow tree to make a stake for a landmark in the prairie, and on his recent examination had found the tree and limb, and pointed them out to the company present. It will be seen hereafter that the witness was probably mistaken with reference to this matter.

A. Anglin and Silas Bates also testified in behalf of the defendants to some facts supposed to be confirmatory of the Hunnicutt survey, and the defendants closed.

The plaintiff introduced J. H. Pierson, who testified that he was the son of J. G. W. Pierson, deceased, who was the surveyor general of Robertson's colony; that among the old surveying papers of his father witness had found two documents, marked X and Y, the first of which purported to be the field-notes of a league of land surveyed by Joshua Hadley for Archibald Powell on the 17th of May, 1835, and the second to be the field-notes of a league surveyed by Hadley on the same day for William Whitaker, and designating the southeast corner of the Powell league, as the first and last calls of the survey for Whitaker. The plaintiff's first bill of exceptions recites, that "after having proved the death of Joshua Hadley, and being unable to prove the handwriting of the said documents, the same were offered by plaintiff for the purpose of aiding and leading to the identification of the Powell league, as originally surveyed on the ground, in connection with other patrol testimony." The defendants objected, "first, because the document X called for the witness-trees in the reverse course to what they were called for in the Powell title; second, because both of the documents were not sufficiently authenticated; and, third, because both of the copies appeared to be copies of the original field-notes." Thereupon the plaintiff proved by

the witness Pierson that the witness and one of the clerks in the general land office had, in the June previous to the trial, examined closely for the original field-notes of the Whitaker survey, and that they could not be found in the office. The court sustained the objections, and excluded the documents; to which ruling the plaintiff excepted.

The witness, Pierson, further testifying for the plaintiff, stated that he was a practical surveyor; that a few months previous to the trial he had examined the Hunnicutt survey of the Powell league, and also the mapped survey of the same league, and was of opinion that the Hunnicutt survey is not the Powell league. This witness also gave in detail a description of his examinations and the results. To exhibit the conflict between his testimony and Hunnicutt's would necessitate an amount of minutiæ which would confuse rather than elucidate the case.

J. M. Springfield, one of the defendants, testified for the plaintiff, that he had examined the willow tree pointed out by the defendants' witness, McCoy, as the same from which he had cut the stake while engaged in the original survey in 1835, and this witness, Springfield, stated that he himself, about eight or nine years previous to the trial, had cut off the limb designated by McCoy.

For the purpose of contradicting another statement made by McCoy, to the effect that Hadley, in that section and the year 1835, made no other survey besides that for Powell, offered in evidence two papers, purporting to be affidavits: one that of Alexander Whitaker, made on the 21st of April, 1838, before G. Morrison, county clerk of Montgomery county, and the other that of W. B. Pillow, made on the 20th of April, 1838, before Z. Robinson, a justice of the peace. The substance of these affidavits, which were marked "No. 40" and "No. 50," was, that Hadley, before the closing of the land office by the consultation, surveyed another league of land adjoining the Powell league. As a predicate for the admission of these affidavits, the plaintiff

proved that the affiants and officers by and before whom they were made were dead. The defendants objected that the officers before whom the affidavits were made were not legally authorized to take them, and that they were not shown to have been in proper custody to be admitted as ancient documents. On these objections the court excluded the affidavits, and the plaintiff took his second bill of exceptions.

The other facts of the case, as well as the errors assigned, are sufficiently shown in the opinion of the court.

Verdict and judgment for the defendants. The plaintiff moved for a new trial, but his motion was overruled, and he appealed.

*James C. Walker*, for appellant.—Bill of exceptions No. 1 shows the object sought by the introduction of the ancient documents "X and Y." These documents, both dated "May 17, 1835," being about twenty-five years old, coming from the custody of J. G. W. Pierson, deceased, former surveyor general of Robertson's colony, both the surveyor general and his deputy, Hadley, having been proved to be dead, were admissible as the declarations of the surveyor. (Elliot v. Bonnet, 3 Yates, 289; 4 Id., 577; George v. Thomas, 16 Tex., 74; Morris v. Vandervin, 1 Dall., 67; Sample v. Robb., 4 Harr., 305.) They were also admissible as ancient documents.

These documents are signed "Surveyed by Joshua Hadley." From this the court held them to be "copies." The appellant contends that they are original documents, made out by Joshua Hadley, a deputy surveyor, and delivered by him to J. G. W. Pierson, the surveyor general of the colony. From document "X" Pierson made out his copy of the field-notes of the Powell league, which are now on file in the general land office.

The survey for Whitaker, document "Y," having from some cause failed to be carried into title, the original field-

notes by J. G. W. Pierson were never filed in the land office, if any such were ever made out by him—leaving document "Y" as the only written evidence of any such survey by Hadley. (Graham v. Moore, 4 S. & R., 467; Blake v. Doherty, 5 Wheat., 359; Sample v. Robb., 4 Harr., 305.)

It is conceded that the authorities generally hold that a subsequent survey cannot be received for the purpose of identifying a former one. But, in the present case, it is insisted that the surveys described in documents "X and Y" were part and parcel of the same block of work, done at the same time, May 17, 1835, by the same surveyor, and were by him connected, or rather run off in a block. So that any declarations by him in the performance of his duty as to the location of the block would be a part of the *res gestæ*, and on that ground, the surveyor being dead, these written declarations of his were admissible. (6 Binn., 59; Walfe v. Wyatt, 11 S. & R. 149; 2 Id., 70; Wagenham v. Adams, 2 Binn., 109.)

Plaintiff expected to prove the Whitaker survey, document "Y," on the ground to correspond with the field-notes in document "Y," and to be substantially the same as the survey now known as the J. W. Carpenter league, which adjoins the mapped location of the Powell league on its entire south boundary. These facts, with these documents as connecting links and explanatory of the facts on the ground, were vitally material to appellant's cause. The facts on the ground, to wit, one of the corners of the Whitaker survey, well marked and defined on the ground, though proved and established beyond the possibility of doubt, yet without the documents "X and Y" showing the connection and explanatory of the corner thus proved, the fact would not only be useless, but irrelevant.

Bill of exceptions No. 2.—What has been said of documents "X and Y" will in part apply to documents "Nos. 40 and 50." The affidavits of Whitaker and Pillow were

executed in conformity to law.   (See act June 12, 1837, sec. 11; Hart. Dig., 1824.)

The documents "40 and 50," relating to the Whitaker survey, document "Y," and that survey having been lost or abandoned, it is insisted these documents were in their "proper custody" when in the possession of any person interested in their contents, and hence the objection is of no avail.   All the parties being dead, they were the best evidence that could be obtained after so long a lapse of time.   We submit they ought to have been received. They show that McCoy was mistaken or swore falsely, and that Hadley did make a survey south of and adjoining the Powell league at the same time he made the survey for Powell.   McCoy says Hadley made no other survey at that time but the Powell league.

Bill of exceptions No. 3.—Defendants' witness, being on the stand, was asked by plaintiff "whether or not the location of the Powell league, as represented on the map, had not been uniformly and generally respected and accredited as the true location by the community around it?" To which defendants objected, because it was hearsay, and sustained by the court.   (6 Peters, 328; Martin v. Atkinson, 7 Ga., 228.)

The second ground in this bill relates to the introduction of certain patents, for the purpose of showing a change of the "mapped location" by the officer of the general land office.   Plaintiff objected, because not competent, a sketch from the map of the general land office being the better evidence; and, even if a change had been made, it was an *ex parte* proceeding between the re-locators and the officers, of recent date, after the mapped location had been recognized by the district surveyors, citizens, and officers of the general land office for more than twenty years.   The maps, as they were formerly, were, *prima facie*, evidence of Powell's location, and he or his assigns could not be thus, without notice, divested of his rights.   It is

42—xxviii

not the policy of the government to break up locations and surveys and destroy titles, so long recognized by the community and by government officers, at the instance of land speculators.

It will be observed by the court that these defendants do not pretend to claim title under these patents, and they stand before this court as naked trespassers, without the shadow of title.

Bill of exceptions No. 4 embraces the charges asked by plaintiff and refused. "1. The plaintiff in this suit is not bound to show that the defendants are on the land; the burden of proof is on the defendants to show that they are not on the land claimed by plaintiff." The defendants plead "not guilty." This plea, in a case on appeal from Texas to the Supreme Court of the United States, was held to put in issue the plaintiff's title. (Spencer v. Lapsley, 20 How., 267.) It will be seen the court charged to the reverse. It would be well to settle the point in Texas.

"2. The map of the county and sketches showing the location of the league of land claimed by plaintiff are, *prima facie*, evidence of the location of the land, as represented on the map and sketches."

"3. And from the pleading in this case the presumption is, that the defendants are on the land as represented by the map and sketches, and plaintiff is entitled to recover, unless the jury believe from the evidence that the league claimed by plaintiff is not located on the ground as represented on the map and sketches."

This court has so repeatedly held the doctrine embraced in the second charge above, that it is not deemed necessary to refer to the cases; and if the second be correct, the third follows as a necessary corollary.

It may be contended that the court gave substantially these charges. But upon examination it will be seen the court so modified and qualified the charges on these points as to destroy their effect with the jury. And even if it were

true that the map had been altered, as we are left to infer from the issuance of these patents, the charge as given placed the map, thus *ex parte* altered, upon the same footing as the maps and other records of over twenty years' standing. The map, when first made, was the result of a contract between the government and Powell, the grantee, both parties being present and contracting. At and since that time the government has repeatedly acknowledged that plat or map, and has recognized Powell's right in the same in divers ways and at different times. By the charge as given, Powell was deprived of all this by an *ex parte* alteration of the map of recent date, in which he was not present or represented.

"4. The jury is further instructed, that where a league of land has been uniformly represented on the maps of the land offices to be located in a particular place, and so recognized by the officers of the government for a long period of time, say twenty years or more, and especially where the surrounding surveys call for the league in controversy, slight evidence is sufficient to sustain the location of the league as laid down on the map."

This charge is certainly in accordance with the policy of the government, the good order of society, correct in principle, and applicable to the case at bar. The government is barred by actual possession of ten years, upon the presumption that there was originally a grant. How much more consistent with reason, justice, and good policy, should the government be estopped by so many repeated acknowledgments of the location of the Powell league in accordance with the map for and during the space of more than twenty years. Why is the "map, *prima facie*, evidence that the land has been taken up" by private individuals? Because the government thereby, and to the extent and in conformity to the plat or map, acknowledged such private right in the contract of location between itself and the first grantee, when no third person was or could have been in-

terested in the land or map.    In the absence .of fraud, it
would seem the government stands, or ought to stand,
upon the same footing as private individuals in reference
to the doctrine of estoppel.

Recitals in a patent are evidence against the Common-
wealth.   (Penrose v. Griffith, 4 Binn., 231.)   The doctrine
reviewed and confirmed in Garwood v. Denis, 4 Binn., 314.
If this be the true doctrine, then the calls of all the pat-
ents of all the adjoining surveys calling for the Powell
league to be on the ground as it is and has been repre-
sented on the map for more than twenty years, should of
itself be sufficient to estop the government.   Add to this
the continued and often repeated recognition of the map-
ped location, by connecting the plats of all the surrounding
· surveys with the Powell, all of which surveys being capa-
ble of identification and fitting up on the ground, so as to
leave just the area for a league where the Powell league is
represented to be by the map, would seem to form a con-
clusive presumption or estoppel against the government;
and speculators should not, after the lapse of more than
twenty years, be permitted to cloak their unjust transac-
tions under the name of the government, and thereby
avoid the estoppel which, had the transactions occurred
between private individuals, would undoubtedly be held
a complete and absolute estoppel.

"5. In order to justify the jury in finding a verdict
which in effect would change the locality of the league, as
it has been represented on the map, the evidence should
be clear and satisfactory beyond a reasonable doubt."

This charge seems to follow as a necessary consequence,
if the long-established location of the league by the maps,
the surrounding surveys, beginning corner on the waters
of Little Brazos, the course and distances of the lines, the
old landmarks found on these lines, are entitled to any
credit.   One sketch from "the old Robertson colony map,"
another sketch "from a map of Robertson county made

at Franklin, June and July, 1839," and a sketch from the present county map, all agreeing, and all representing the Powell league to be where we claim it to be at the present time.

If you were to take a chain and compass, theodolite, and even a microscope, and should attempt to find the town where one of the above maps was made, I doubt very much whether you could discover even the trace of the once flourishing town of Franklin. Is it then wonderful that landmarks of surveys made years previous should have been destroyed or gone to decay by this time?

"6. If the jury believe from the evidence that there is any one point on the mapped location from which the survey of the Powell league may be commenced and run out according to the field-notes of the grant to Powell, it is sufficient to establish the league as mapped, unless the jury believe from the evidence that the location sought to be established by the defendants is the true location of the Powell league beyond a reasonable doubt."

The only question is, was this charge applicable to the case? Besides the long-continued location of the league, as claimed by plaintiff on the maps, the calls of all the surrounding surveys fitting up snug around the location as mapped, the testimony of Pierson, the former county surveyor, shows that there was such a point on the mapped location, from which the league might have been run out according to the field-notes in the Powell title, in harmony with all the surrounding surveys, and in accordance with the natural objects in the Powell grant.

No brief for the appellees furnished to the *Reporter.*

COKE, J.—This is an action of trespass to try title, commenced in the District Court of Falls county by the appellant, against the appellees, for the recovery of the southeast half of the league of land originally granted to Archibald

Powell, and alleged to be situated in Falls county. The appellees went to trial on the plea "not guilty." The appellant's chain of title from Archibald Powell, the original grantee, down to himself, is admitted to be perfect. The appellees exhibit no paper title. They defend exclusively on the ground that the land described in appellant's title deeds and in his petition is not the same that they are possessed of. The contest is as to the *locus in quo* of the Archibald Powell league.

There were a verdict and judgment for the appellees, (defendants in court below,) motion for new trial overruled, and the case is brought to this court by appeal.

Various errors are assigned, which will be considered in the order of their assignment.

The first is, that the court erred in the rejection of the testimony offered, as indicated by plaintiff's bill of exceptions No. 1.

We are of opinion that this assignment is not well taken, and that the documents described in this bill of exceptions, when offered as evidence, were properly rejected. They are not authenticated in any mode, or offered under any sanction known to the law, which entitle them to admission and standing in court as instruments of evidence.

It is insisted by appellant's counsel that these documents, being twenty-five years old when offered as evidence, were ancient writings, purporting to have been made and signed by Joshua Hadley, who is proved to have been a deputy surveyor, and to have been found among the old surveying papers of Pierson, the surveyor general of the district in which the land was then situated, and brought forward by his son, John H. Pierson; that they came from the proper custody, and prove themselves; and that, Pierson and Hadley both being dead, they are admissible, as their declarations, as part of the original *res gesta* on the question of boundary involved in this case.

It is one of the fundamental rules of evidence, that all

private writings must be proved to be genuine before they can be admitted as evidence. One of the exceptions to this general rule is where a deed is thirty years old, in which case it is said to prove itself: the subscribing witnesses being presumed to be dead, and other proof being presumed to be beyond the reach of the party. (1 Greenl. on Ev., §§ 557, 570.)

In order to have this effect, such an instrument must be free from suspicion, and come from the proper custody, and must have been acted on so as to afford some corroborative proof of its genuineness. The principle on which this exception to the general rule is founded would seem applicable to ancient writings of any description which might be evidence of present rights.

It has been held that proof of possession under or referable to an ancient deed, and running with it, is indispensable to its admissibility. (12 Leigh, 524; Lewis v. Laroway, 3 Johns. Cas., 283; Jackson *ex dem.* Burnham v. Blanshard, 3 Johns., 292.)

But the weight of authority seems to have established the principle, that when proof of possession cannot be had, the deed may be read upon proof of other circumstances corroborative of its genuineness. (1 Greenl. on Ev., § 145 and authorities in note.)

What circumstances of corroboration shall be necessary to authenticate a deed or other writing offered under this exception to the general rule, which requires proof of execution, must greatly depend in each case upon the purpose and character of the instrument. They must be auxiliary to its apparent antiquity, and sufficient to raise a reasonable presumption of its genuineness. If "exhibit X," which imbodies a substantial copy of the field-notes of the Powell league, in addition to the corroborating circumstances surrounding it, had been aided by slight evidence sustaining the genuineness of the handwriting as that of either Hadley, the deputy, or of Pierson, the principal, it

might properly have been admitted to the jury as evidence. (Sample v. Robb, 4 Harr., 307, 16 Pa. St.; Urket v. Coryell, 5 Watts. & Serg., 60; Warren v. Lane, 5 S. & R., 60.) But offered as it was, so far as the record shows, without an effort to prove the handwriting, when McCoy, who carried the chain for Hadley and helped him survey this very Powell league, and lived in the house with him nearly a year, and John H. Pierson, the son of the surveyor general, the man who found these documents among his father's old papers, were both present at the trial and witnesses in the case, both of whom ought in reason to have had some acquaintance with the handwriting of both Hadley and Pierson, we think it was clearly right to exclude it. This failure or omission of itself excites a suspicion of the genuineness of the paper; suspicion which is strengthened, when it is considered that both Hadley and Pierson were public and prominent officers of the government, with whose genuine handwriting a great many persons are likely to be acquainted.

"Exhibit Y," the other paper embraced in this bill of exceptions, contains what purports to be the field-notes of a league of land surveyed for one Whitaker. It is admitted that this land was never titled to Whitaker, and that the field-notes are not to be found in the general land office. It is conjectured that this league of land was in 1845, ten years after the date of "exhibit Y," patented to one Carpenter. No other survey is shown to call for the Whitaker survey. There is not a single circumstance corroborative of the genuineness or antiquity of this paper, except that it is found among the old papers of Pierson. No act or conduct of any person referable to it is proved, no right is shown to have been claimed under it, no record of it is found, no such survey has ever been mapped. It is offered in evidence a naked, isolated, unproved, and uncorroborated paper, with an additional presumption against it, arising from the failure of the appellant to

make an effort to prove its genuineness, when it may reasonably be supposed that, if genuine, some proof of it might be obtained. That such a paper, under the circumstances surrounding it, should not be admitted as evidence is too plain for argument.

The inadmissibility of either one of these papers would have been sufficient to sustain the ruling of the court excluding both, because they were offered together, and, as far as the object with which they were sought to be introduced can be gathered from the record and the bill of exceptions, the rejection of either would have rendered the other unimportant.

If the genuineness of these papers had been sufficiently proved, we are of opinion that they would have been admissible in evidence as the declarations of the party making them, for the purpose of aiding in the ascertainment of the boundaries of the Powell league. In Speer v. Coate, 3 McCord, 229, in reference to the declarations of a deceased chain-carrier who had pointed out to the witness a certain corner-tree of the survey, it is said by the court, "It cannot be doubted at this day that the declarations of deceased persons who shall appear to have been in a situation to possess the information, and are not interested, shall, on a question of boundary, be received in evidence."

The same doctrine is, if possible, more strongly asserted in Blythe v. Sutherland, Id., 259, where the declarations of a deceased surveyor, who had pointed out to the witness a corner of the survey, were ruled admissible. This latter case is cited with apparent approbation by Chief Justice WHEELER, in delivering the opinion of this court, in George v. Thomas, 16 Tex., 92. It was not pretended, in either of these cases, that the declarations were a part of the *res gesta*.

Evidence of this character, except when it was a part of the original *res gesta*, was not admissible at common law

to prove the boundaries of a private estate. Its admission was restricted to cases involving questions of a general or public nature. If the matter in controversy were ancient, and not susceptible of better evidence, any proof in the nature of traditionary declarations, whether oral or written, if it appeared that they were made by parties having competent knowledge, was receivable, subject to the qualification that it must be a matter of public or general interest. (White v. Lisle, 4 Madd. Ch., 214, 224; Doe v. Thomas, 14 East., 323; 1 Greenl. on Ev., §§ 138, 139.)

The question of the admissibility of this character of evidence seems to have turned upon the nature of the reputed fact, whether it were of interest to one party only or to many. If the latter, it was admissible; if the former, it was excluded. The tendency of American decisions has been to break in upon this rule of the common law, in reference to questions of private boundary, and to remove the restrictions which exclude evidence of this character in such cases. This has been the result of necessity. Our landmarks are usually of perishable materials, and by the settlement and improvement of the country, and from other causes, they are constantly being destroyed. It is therefore indispensable in many cases that hearsay or reputation should be received to establish old boundaries. (Boardman et al. v. Lessees of Reed et al., 6 Peters, 341; 1 Greenl. on Ev., § 145, and authorities cited in note; Sample v. Robb, 4 Harr., 307.)

In Sasser v. Herring, 3 Den., 340, the chief justice, delivering the opinion of the court, said: "We have in questions of boundary given to the single declarations of a deceased individual, as to a lien or corner, the weight of common reputation, and permitted such declarations to be proved, under the rule that in questions of boundary hearsay is evidence. Whether this is within the reason and spirit of the rule is now too late to inquire; it is the well-established law of this State. And if the propriety of the

rule were now *res integra*, perhaps the necessity of the case, arising from the situation of our country, and the want of self-evident *termini* of our lands, would require its adoption." There is a strong array of American authority which seems to support the common-law rule. But the courts of a majority of the States, it is believed, hold the same doctrine asserted in the cases I have cited from North and South Carolina.

The 2d assignment charges error in the ruling of the court excluding the documents imbodied in bill of exceptions No. 2 when offered in evidence. These documents were sought to be introduced with a view to contradict and discredit the testimony of the witness McCoy. We do not think that they would necessarily have had that effect if they had been admitted. It is unnecessary to discuss the question whether, considering the object in offering these papers, it would have been error if they had been excluded on the ground of irrelevancy, as it is clear that they were correctly excluded on the ground that they were not authenticated or proved in any mode which entitled them to be read as evidence. The death of the parties by whom, and the officers before whom, these papers purport to have been made, was proved. Upon this predicate they were offered as evidence. No effort was made to prove the handwriting to be that of either of the officers or either of the parties concerned in making them. The record is silent as to the custody whence they came. It is not pretended that they are either originals or copies of any .public record. In a word, these papers were thrust forward unsupported by proof of a single circumstance corroborative of their genuineness or antiquity. The same reasons which sustain the propriety of the ruling of the court excluding the documents described in bill of exceptions No. 1 apply with increased force against the papers in question, and fully vindicate the action of the court in rejecting them.

It does seem that if the papers described in the two bills of exception which we have been considering are genuine, some evidence of it could be adduced. Evidence of the making or execution of papers of the age that these seem to be, where the custody from which they are produced is that from which such papers might naturally and reasonably be expected to come, and when they are accompanied by circumstances consistent with their fairness and genuineness, and there is nothing to excite suspicion against them, is not expected to be so direct and full as would otherwise be required.

The law in such cases is indulgent, and does not demand that complete measure of proof which is required in more recent transactions. Evidence, for instance, in regard to the proof of handwriting, which is not admissible under the rules in respect to recent transactions, but which is persuasive of the genuineness and authenticity of the document, is freely admitted where the instrument is aged. (Coulson v. Walton, 9 Pet., 70; Bennet v. Runyon, 4 Dana, 422; 4 Phil. on Ev., 371, notes.) The fact that no evidence of this character, which may be reasonably presumed by proper diligence to be accessible, was attempted to be adduced in favor of the writings in question, and that no account is given of the custody of those mentioned in bill of exceptions No. 2, is a strong circumstance against them, which, unexplained, precludes presumptions which might otherwise have been indulged in their favor.

We will in this connection, because governed by the principles we are now discussing, consider, though out of its order, the ruling of the court rejecting the testimony of the witness Copps, which is assigned as error. This witness was asked by the appellees on the trial, "Whether or not the location of the Powell league, as represented on the map, had been uniformly and generally respected and accredited as the true location by the community around it?" This question was objected to by the appellees, and

the objection sustained by the court, and we think properly.

The rule that old boundaries may be proved by the common reputation and understanding of the neighborhood, where the land lies, would seem better established, and to stand in principle on higher ground than the one we have been considering, which admits the declarations of deceased persons of competent knowledge and having no interest, as evidence. (Tate v. Southard, 1 Hawks, 45; Taylor v. Shufford, 4 Id., 116; Lessee of McCoy v. Galloway, 3 Ham., 282; Boardman *et al.* v. Lessees of Ford *et al.*, 6 Pet., 341.)

The admission of evidence of common reputation as to old boundaries, which frequently cannot possibly be proved by direct and positive testimony, is based on the extreme probability of the truth of a fact received, assented to, and acted on as true by the common consent of a community having peculiar means for correct information, and no interest to warp their judgment in forming a conclusion.

In the absence of direct and positive testimony which, when they are ancient, cannot usually be had to establish boundaries, common reputation is perhaps as little liable to error as any other species of evidence that can be resorted to for the purpose, and, indeed, is frequently the only resort.

The general rule is undoubted, that common reputation is admissible as evidence in questions of boundary, but there is much diversity of opinion as to its proper application. (Boardman *et al.* v. Lessees of Ford *et al.*, 6 Pet., 341.)

The unrestricted admission of this species of evidence would be fraught with the most dangerous tendencies, and violative of the best dictates of experience. The admissibility, as well as the value and weight, of general reputation must, from its nature, depend very much upon the circumstances of the case in which it is offered. It cannot, of course, be received as to title. It is admissible only as

to the *locus in quo* of the boundary, a fact of which the community or neighborhood around it is supposed to be peculiarly well informed. The boundary must be an ancient one, and its supposed locality must be of sufficient interest and note in the neighborhood or community to have been the subject of observation and conversation among the people. The reputation or understanding must be general and concurrent. There, weight of opinion or neighborhood report is not common reputation. The reputation or understanding must have been formed and in existence before the controversy commenced in which it is used as evidence. Men are not presumed to be indifferent in regard to matters in actual controversy, for when the contest has begun, people generally take one side or the other, and, if they are disposed to speak the truth, facts are or may be seen by them through a false medium. Greenl. on Ev., § 131, note.)

For this reason, it is necessary that proof of common reputation must have reference to a time *ante litem motam.* The question propounded to the witness, Copps, is general, and not limited even to the filing of the suit. It is not limited to any particular time. It is further objectionable, because it seems directed more towards proving the correctness of the map than the locality of the boundaries of the survey on the ground. The court ruled upon the question as propounded, and the ruling is correct. Hearsay evidence is generally inadmissible. Desiring to introduce evidence under an exception to that general rule, it devolved upon the appellant to bring himself within the limits of the exception, which he failed to do.

The 3d assignment of error brings in question the ruling of the court admitting certain patents in evidence over the objection of the appellant, being introduced, as is shown by the bill of exceptions, "for the purpose of showing a change of the mapped location of the Powell league by the officers of the general land office." These patents

appear from the evidence to cover land formerly shown by the land-office map to be covered by the Powell title. They appear to have been introduced simply in rebuttal of the presumptions arising in favor of the appellant from a sketch from the land-office map introduced in evidence by him, which showed the location of the Powell league to be as claimed by him. We do not perceive any error in their admission for this purpose. If the appellant were entitled to presumptions arising from an introduction of the map, the appellees were entitled to repel that presumption by showing that the officers of the government regarded the map as incorrect.

The first question arising under the 4th assignment of error is upon the refusal of the court to instruct the jury, at the request of appellant, as follows: "1. The plaintiff in this suit, under the pleadings, is not bound to show that the defendants are on the land; the burden of proof is on the defendants, to show that they are not on the land claimed by the plaintiff."

There was no error in the refusal of the court to give this instruction.

It is a proposition that cannot be disputed, that a naked possessor of land is entitled to hold it until a perfect title is proved against him. The claimant or plaintiff must prove the title under which he claims, and must also prove that the land described in his petition is the same possessed by the defendant, unless he is relieved by the pleading or admission of the defendant from so doing. Such is the common-law rule in actions of ejectment. (Adams on Eject., § 277; Greaves v. Ruby, 2 B. & A., 948; Pope v. Pendergrast, 1 Marsh., 122.)

In this case the defendant plead "not guilty," and the 5th section of the act of February 2, 1844, (O. & W. Dig., Art. 2051,) provides that they shall not be required to put in any other plea. By this plea they admit nothing, but demand strict proof of everything necessary to sustain the

plaintiff's action. If this plea be construed to admit the identity of the land in their possession with that claimed and described in plaintiff's petition, and only to put in issue the title, (the idea on which this instruction is predicated,) it would, in effect, be to require the defendants, in order to avail themselves of the full measure of the defense relied on, to plead it specially, in express contravention of the statute, which provides that they shall not be "required to put in any other plea than the one of not guilty."

The 6th section of the act of 1840, (O. & W. Dig., Art. 2042,) which provides that it shall not be necessary to prove an actual trespass on the part of the defendant in order to maintain actions of this character, is cited by appellant's counsel as establishing the propriety of this instruction, and the error of the court in refusing it. We are of the opinion that it does not have this effect.

By the act of 1840, the common-law action of ejectment, with its fictions, was abolished, and the present form of action of trespass to try title was instituted. It was designed as a simple and direct mode of litigating and quieting titles to lands which in almost every section of the country were conflicting and unsettled. Nine-tenths of the appropriated lands of the country were unoccupied, and in a majority of instances the claimants resided at a distance from them, and in many instances had never seen them. No actual trespass could be proved, because in many instances no actual entry had been made. It became necessary, in order to adapt this remedy to the necessities of the country, to enable parties who desired its benefits to avail themselves of it without the necessity of proving actual trespass, and for this purpose the clause of the statute under consideration was enacted.

Its intention was simply to give an unobstructed remedy, by dispensing with a mere formality, not involving any right of the defendant. It was not the intention, nor is it

the effect, of this clause of the statute to shift the burden of proof, nor in any way to change or interfere with the general principles of law governing the rights of parties.

We are of opinion, that the plea of "not guilty," in actions of trespass to try title, goes directly to the points in dispute under the evidence, and throws upon the plaintiff the burden of proving everything in relation to these points that is necessary to maintain his suit and entitle him to recover.

The issues under this plea are in effect made by the evidence, and if any fact is found controverted there which is necessary to entitle the plaintiff to recover, the burden is on him to prove it. In this case, the evidence shows that the plaintiff claims land which is in possession of the defendants. They deny that this is the same land described in plaintiff's petition. The burden lies on the plaintiff to identify the land by proof. (Rivers v. Foote, 11 Tex., 662; Dally v. Booth, 16 Id., 565; Ayres v. Duprey, Galveston term, 24th March, 1864,) [27 Tex., 593.]

It is not deemed necessary to discuss the various questions presented by the other instructions asked by the appellant, and refused by the court on the trial of this case, which are raised under this assignment of error, nor to decide whether, as abstract propositions, they are law. What are boundaries, and how they may be established or identified, and the rules that shall govern in ascertaining and deciding as to their locality, has been discussed so repeatedly in this court, and so well settled in its adjudications, that it would be a useless and unprofitable consumption of time to travel over the same ground again, only to reach conclusions with which we are already satisfied. It is only necessary to say, that so far as the charges requested by the appellant were proper to be given, they were substantially imbodied in the able and lucid exposition of the law of the case given by his honor the district judge in his instructions to the jury. These instructions, we think,

43—xxviii

presented the law, as established and settled by the adjudications of this court and applicable to the facts of this case, fully and fairly to the jury. We are of opinion that there was no error in refusing the charges asked, and that there was no error in the charges given. (Hubert v. Bartlett, 9 Tex., 97; George v. Thomas, 16 Id., 74; Bolton v. Lann, Id., 96; Mitchell v. Burdett, 22 Id., 633; Booth v. Upshur, Austin term, 1861,) [26 Id., 64.]

The question of the sufficiency of the evidence to support the verdict, arising under the 5th and last assignments of error, only remains to be considered. We have felt some embarrassment in arriving at a conclusion on this point.

We are inclined to the opinion, while the testimony as to the true locality of the land (which is really the only point in controversy in the case) is very nearly evenly balanced, that it preponderates in favor of the locality as claimed by the appellant, and consequently against the verdict of the jury. Pierson, who is a practical surveyor, was the chief witness on behalf of the appellant, and Hunnicutt, also a practical surveyor, was the leading witness on behalf of the appellees. Each one of these witnesses made efforts by actual survey to define the locality of the Powell league. Pierson's survey locates the land on the ground where the county and land-office maps originally showed it to be, between the Harrell and the Welch leagues, with the J. W. Carpenter league on its south boundary line. Hunnicutt's survey, according to the diagram accompanying his testimony, so defines it as to put it in conflict with the Welch league on the east, and some other surveys, not named, on the south, leaving the appellees, who, according to Pierson's survey, are on the land claimed by the appellant, outside of its lines.

While both these surveys are exceedingly indefinite and unsatisfactory, we think, perhaps, that made by Pierson is better sustained by other circumstances in proof than the

Hunnicutt survey  It accords with the mapped location of the land made at a time when the evidences of its locality were necessarily more apparent than now.   The surrounding surveys call for the Powell league on the ground where Pierson's survey places it.   It is proved by both Hunnicutt and Pierson that there is about the area of one league of land between the Harrell and Welch leagues, between which two the Powell league is represented on the map, and was originally supposed to lie.

There is testimony in the record which shows that it may be possible that the survey, alleged by Hunnicutt to be the Powell league, may be an old survey, which was made in 1835 for a party who rejected it; this is shown by the testimony of the witnesses, Anglin and Bates.   But, on the other hand, the testimony of Hunnicutt is corroborated by the direct and positive testimony of the witness McCoy, who was one of the surveying party who made the survey of the Powell league in 1835; who says that the boundaries found by Hunnicutt, and claimed by him to be the boundaries of the Powell league, are the true boundaries of that league as originally surveyed.   The testimony of this witness is assailed by the appellant, on grounds which, though not devoid of plausibility, are not inconsistent with the integrity or correctness of his testimony. An impression, however, is left upon our minds, from the whole testimony, of a possibility, that this witness may have been mistaken, after the lapse of so many years, in his identification of the survey in a country which the testimony shows has changed considerably in appearance by the growth of brush and timber.   This impression is not a little strengthened by the "willow-limb" story, which shows that his memory is not to be implicitly relied on.

His testimony, however, is positive, and is somewhat corroborated by that of the witness, Bates, in regard to the pointing of the hacks or marks on the north line of the Powell league.

While we are of opinion that the jury found against the weight of the evidence, and that a verdict for the plaintiff would have been more in accordance with the facts and the immemorial policy of the law, which discountenances the disturbance of the peace of communities and the rights of individuals by unsettling landmarks and boundaries that have been so long established and acquiesced in, we cannot say that there is not evidence to support the verdict. There is great conflict in the testimony. The jury had all the facts before them. From having seen the witnesses, and heard their testimony, and observed their manner of testifying, they were in a much better position to judge of the weight and degree of credit to be attached to their statements than we could possibly be by an inspection of the record.

The jury are the exclusive judges of the weight and credibility of testimony, and especially is this the case where the testimony is conflicting. Under such circumstances it is well settled in the adjudications of this court, that a verdict will not be disturbed because the jury may have erred. In order to justify this court in setting aside such a verdict, it is not sufficient that it does not appear clearly to be right; it must appear to be clearly wrong. And we are not prepared to say that the verdict in this case is clearly wrong. (Ables v. Donley, 8 Tex., 331; Stewart v. Hamilton, 19 Id., 101; Gamage v. Trawick, 19 Id., 58.)

We feel the less hesitancy in affirming this judgment from the fact that the rights of the appellant are not concluded by it. He has the right, under the statute, to another adjudication upon the subject-matter of this suit, if he choose to avail himself of it, by instituting another suit within twelve months.

There is no error in the judgment, and it is

AFFIRMED.