Judge Ewing
delivered the Opinion of the Court.
Lewis Johnson filed, his bill, alleging that, at and anterior to the 21st of November, 1831, he was an actual settler with a family, in the land district west of the Tennessee river. That anterior thereto, he had, in good faith, improved the south west quarter of section 20, township 5, range 3, east of the meridian line. That on said day, he was the owner, occupier, and cultivator of the improvement, and the actual settler thereon. That, as such, he had the pre-emptive right for twelve months, to enter and appropriate the same. That, on the 22d of October, 1832, that he, intending to avail himself of his pre-emptive privilege, did tender to the receiver, in his office at Waidsborough, forty dollars in Commonwealth’s paper—the State price for the quarter, and proffered to enter the same. But that John Gresham, on the 30th of January, 1832, having entered it, the receiver refused to permit it to be again entered. He exhibits the receiver’s certificate, as evidence of the tender and refusal; alleges his continuance in the occupancy of the improvements, and prays that Gresham may be compelled to surrender to him his title, upon his paying to him the State price advanced by him, in the acquisition of the same, and that he may be quieted in his possession.
Gresham answered the bill, admitting his entry and appropriation of the land, and exhibiting his patent, but controverting the jurisdiction of the Court, and the pre-emptive right of the complainant.
It appears from the testimony, that Johnson lived on a quarter adjoining. That section 20 embraced six hundred and ninety-six acres of land; that, by dividing it *543 into four parts, and running out the quarters according to the original lines and corners, and allotting to each quarter an equal quantity, the quarter in contest embraced one hundred and seventy four acres, instead of one hundred and sixty. That, when run thus, it embraced from one to three acres of Johnson’s field, which extended over the line of the quarter upon which he lived, and also a pen, with a door, made of poles, used by him as a wash house. But when run so as to embrace only one hundred and sixty acres, in a square, the pen was embraced, but the field excluded. The tender and proffer to locate, by Johnson, on the day charged in the bill, and the refusal by the receiver to receive his entry, were also shown.
The act of 1820, ‘ to provide for laying off the lands west of the Tennessee river, into townships and sections ’ directed that the townships shall be 6 miles square, divided into sections of 640 acres each, and that, half a mile from the corner of each sec. trees, posts, or stones, should be marked for the corners of quarter sections. But the sections, as actually surveyed, vary in quantity, and the objects marked for corners of quarter sections are not always to be found. Where those objects can be found, they must determine the boundaries of the quarter sections; where they are missing, and their places cannot be discovered, the boundaries of the quarter sections must be established by dividing the section, by lines parallel with the lines of the section into four equal parts: so that, in a section which happens to contain 696 acres, a pre-emptive right to a quarter of it, embraces 174 acres.
Upon these facts several questions arise.
First. How shall the quarter in contest be surveyed, or what land is embraced in it?
Secondly. Was Johnson a settler within the pre-emptive privileges of the statute of the 21st November, 1831?
Thirdly. Was his improvement such as to afford him the protection of the act? And,
Fourthly. Can a court of chancery afford him relief?
First. Though the act of 1820, providing for surveying the lands west of the Tennessee river, directs that it shall be laid off into townships of six miles square, and divided into sections “containing, as nearly as may be, six hundred and forty acres each,” yet it is well known, through the unevenness of the ground, the inaccuracy of instruments, and carelessness of surveyors, that many sections embrace less, and many more, than the quantity directed by the act.
The question, therefore, occurs, how the excess or deficiency shall be disposed of among the quarters. The statute further directs that, in running the lines of townships, and the lines parallel thereto, or the lines of sections, “ that trees, posts, or stones, half a mile from the *544 corners of sections, shall be marked as corners of quarter sections.” So far, therefore, as the corners or lines of the quarters can be ascertained, they should be the guides, and constitute the boundaries and abutals of each quarter. In the absence of such guides, and of all other indicea directing to the place where they were made, the sections should be divided, as near as may be, between the four quarters, observing, as near as practicable, the courses and distances directed by the act.
“It shall not be lawful for any person, within 12 months after the passage of this act, to enter any quarter section, or fractional or sec. of land which has been improved by any actual settler in the land district west of the Ten. river at the passage of this act.” S. L. 1064. Held that this act does not include all lands in the district which had been improved by any person residing there, but applies only to the actual settler upon the land which he has improved: and that the improvement to which alone the act applies, is that upon which the improver is settled. And, tho’the pre-emptive right given by the act, must be restricted to the improvements of the occupant, it is not restricted to the quarter section on which his dwelling may be; the improvement or settlement will include the whole farm, with all its appurtenances.—And any ‘ improvement, however small, is within the protection of the act, if connected with the settlement & used in its enjoyment.
*544 When laid down according to these rules, the quarter in contest embraces one hundred and seventy four acres, and covers a part of the field of the complainant, as well as his wash house.
Secondly. The statute of the 21st of November, 1831, prescribes that “ it shall not be lawful for any person, “ within twelve months after the passage of this act, to “ enter any quarter section, or fractional quarter section of land, which has been improved by any actual “ settler, in the land district west of the Tennessee river, “ at the passage of this act; and any entry made contrary to the provisions of this act, is hereby declared “ null and void: provided, however, that said settler or “ improver may, at. any time, enter the same.”
The question occurs—who is the actual settler contemplated by this act, and what is the improvement intended to be protected? Was he the settler, or resident in the district, or the settler on the land intended to be protected?
We have been much perplexed in coming to a satisfactory conclusion, in our own minds, on this subject. This and other statutes on this subject are so unskilfully and awkwardly drafted, as to produce some doubt and difficulty, as to the real intention of the Legislature. But after a careful examination of all the acts upon the subject, and mature reflection, we are of opinion, that it was the improvement of the settler on the land that was intended to be protected, or the settlement of the settler, and not the improvements of settlers or residents in the district generally. And we have been brought to this conclusion from the following considerations.
*545 It has ever been a favorite policy with the Legislature, to afford protection to the home and fireside of the settler; and it is rare, if ever, that they have looked to, or afforded protection to, improvements not attached or appurtenant to the settlement. And the whole body of prior legislation, in reference to the lands on the west of the Tennessee, seemed to have looked to the protection of the home only of the settlers. These are persuasive considerations with the Court, that a different policy was not intended by the Legislature, in the act of 1831.
But, as confirmation of this view, it seems that, in the fourth section of the act of January the 8th, 1829, nearly the precise language of the act of 1831, is used. And in the second section of the act of January 22d, 1830, the identical language is used, as in the act'of 1831. And the prior sections of the act of 1829, and the third section of the act of 1830, clearly designate what they intended by the use of the term the settler; and confine the protection to the quarter on which he is settled. These sections in the acts passed at the two next preceding sessions of the Legislature, have given a legislative exposition of their meaning in the use of the precise terms of those adopted in the act of 1831.
It is not therefore reasonable to presume, that the Legislature, after having given their exposition of the meaning of the general terms used in the two prior acts, intended that a different or more extended meaning should be attached to the precise same language ingrafted in the statute of 1831. Indeed, the latter statute seems to have been copied from the second section of the act of 1830; as it does not seem probable that such a precise identity of language, could have occurred without. If so, did the Legislature mean one thing in the second section of the former act, and another thing in the latter act? Is it not more reasonable to believe that they meant the same thing in both—especially as one is copied from the other?
It is true that the Legislature have dropped, in the the act of 1831, the provisions which were contained in the former acts, as to the mode of proving the settlement, and obtaining and presenting to the Receiver, a *546 certificate of settlement; and with it, have chopped the explanatory provision, as to their construction of the second section.
But the public lands having been reduced to the same price as to all, it was no longer necessary to retain it for that object, and having once given an exposition of their meaning, it was thought unnecessary to repeat it in subsequent acts, penned in the same language with the former. And the more especially, as the act of 1831 and subsequent acts were evidently intended as a continuation of the pre-emptive privilege granted in the former acts.
The provisos in the subsequent acts, restricting the protection to two quarters, may have their full force without conflicting with this construction. A settlement may extend to more than one quarter. It may exist upon three or four. The provisos in the latter acts, were intended, therefore, to limit and restrict the preemptive right to two quarters only.
Besides: the language of the act is quite susceptible of the construction which we have given it. It may well be contended that, the terms “ in the land district west of the Tennessee river,” were inserted to designate the section of country, where the protection was intended to be afforded, and not the settler generally in that country. A slight change in the collocation, would make this interpretation evident. If the foregoing words were inserted in the sentence, immediately after the word “ land,” or after the word “ improved ” in the preceding part of the sentence it would then read thus: It shall not be lawful for any person &c. to enter any quarter section of land in the land district west of the Tennessee river, which has been improved by any actual settler, or any quarter section which has been improved, in the land district &c. by any actual settler.’ If this were the collocation, it could not be doubted, but that the Legislature meant, not the settler in the land district generally, but the settler on the land intended to be protected. And, though the collocation is different in the act, the same interpretation and qualification may be given to them as if placed in the order designated, *547 without doing violence to any rules of grammar, or authorized rules of construction.
The term ‘improvement' - a very comprehensive term, as used, in the legistation of this state — defined.
Besides: the terms “actual settler'” seem to imply a' settler upon a designated tract of land. The term settlement, in our legislation has been generally used to design the place of location, and actual settler to express the person located thereon.
If the Legislature intended to apply the protection to all that class of individuals, who should be permanently located in the district, without regard to the land settled on, it is most probable that they would have used the term residents in the district, and not the terms actual settlers.
Upon the whole, therefore, we are constrained to come to the conclusion, that the settler on the land improved, was intended, and the improvement upon which he-was settled, was the improvement contemplated by the act.
But, thirdly—the term improved, or improvement of an actual settler, is used, and the protection extended to the improvement. And, though we would restrict the pre-emptive right to the settlement of the occupant, we do not feel warranted in restricting it to the quarter on which his domicil is located. But it embraces, also, his farm and outhouses, and any other improvements appurtenant to, and connected with, his farm or settlement, in his use and occupation, and contributing to its full enjoyment. Such improvements are parts of his settlement, to deprive him of which would more or less impair it. The improvement is protected; and improvement is a comprehensive term, and means any melioration, whereby land is converted from its natural state, to a state and condition for the use and enjoyment of man. It may consist in clearing; fencing, building, and other ways of converting the soil to the use of man, by meliorating its condition.
As the Legislature had an undoubted right to extend its protection to any class of improvements they might think fit, and have not defined the extent or character of improvement which was meant, we would not undertake to limit the legislative bounty. Any improv *548 ement, however small, would be entitled to protection, if appurtenant to, and connected with, a settlement, and used in its enjoyment.
The intention with which an improvement was made, is not material, as regards the right of preemption allowed by the act 1831 (S. L. 1064) ‘to protect the actual settlers west of the Ten. river.’
A settler on land west of the Ten. with a pre emption, has an inchoate right, but has no legal title; and can obtain none when the land has been entered by, and patented to, another person: the remedy is in equity.
Tho’ the act ‘to protect the set-tiers west of the Ten. river, declares that entries made contrary thereto, shall be null and void— that provision is for the benefit of the settler. He may waive his right, and make no entry within the time allowed him: in that case, as none but him could complain of an entry made by another, a patent obtained by another, it seems, would confer an indefeasible title. And if an entry is made and a patent obtained in violation of a settler’s pre emption, and he, by bill in eq. can draw to himself, the title so obtained, it might save a resort to a circuitous remedy. And—
*548 The settlement of the settler was intended to be protected unimpaired.
The labor of the hardy pioneer was regarded as his wealth, and that labor, without discrimination as to quantity, was intended to be secured to him, by reserving to him, for a limited period, the right to appropriate the land upon which it was expended.
Nor is there any limitation, in the act of 1831, as to the number of quarters to which the settler is restricted. Any one or more quarters to which his improvement extends, is protected. Nor does it matter whether he made the improvement, with the intention of appropriating the quarter upon which they were made, at the time when they were made. They are still his improvements, and fall within the legislative protection.
Applying these principles to the case before us, the field and fencing, as well as the wash house of Johnson, were all improvements, made by the labor of Johnson, in his possession, attached to his settlement, and used by him in its enjoyment. They were his improvements, and composed parts of his settlement, and to which no other had a right but himself and the Commonwealth. To enable him to secure which to himself, the Legislature, in their bounty, have thought fit to grant to him, for twelve months, the pre-emptive right to locate the quarter on which they were made. And all others are inhibited, within that period, from entering the same.
Fourth. We have as little doubt that a Court of Chancery may afford relief. The settler has an inchoate or initiate equity; and it would seem that a Court of Equity is the appropriate tribunal for asserting it. He has no legal title, and cannot obtain one by any act of his, while the outstanding patent remains in force.
And though the statute of 21st November, 1831, declares any entry made contrary to the provisions of the act, null and void, this provision was intended for the benefit of the improver, to enable him, within the *549 time limited, to appropriate the land. As to him, it is void; but he may waive his privilege by never attempting, within the time reserved, to make an entry of the land. If so, and a patent has issued upon such entry, it would seem that no other would have a right to complain. And that a patent vesting the right of the Commonwealth in him, would be good against the whole world, except the improver. If so, and the improver can draw to himself the title of the patentee, it would seem that he would be secure, without resorting to the circuity of remedy by mandamus (if such remedy should be admitted to be appropriate,) and more complete equity afforded to the patentee, by restoring to him his money advanced in paying the State price.
Tho’ the entry is void, by the terms of the act, the patent is not—and query, whether the Receiver and Register could be compelled, by mandamus, to receive an entry, and issue a patent, for land which had been entered before: if they could, the first patent, the patentee being no party to the mandamus, would still remain in full force. All these difficulties, the Chancellor could obviate, and could settle the whole controversy—decreeing that the money paid for the land, by the patentee, should be reimbursed to him, by the settler &c. The subject is therefore peculiarly fit for chancery jurisdiction.
Besides: though the entry is declared void, the patent is not. And, though a mandamus might go to compel the Receiver to admit the entry, it would be still further necessary to sue out a mandamus to compel the Register to issue a patent. And these officers have no power by law, to receive more than one entry, or issue more than one patent, for the same quarter, and having exhausted their powers in admitting one entry, and issuing one patent, before, for the same identical land, without knowledge of the complainant’s pre-emptive right, it might well be questioned, whether they could be compelled to receive another entry, and issue another patent, while the former was outstanding and uncancelled. And if they could, the action of the Court on the mandamus against them, could not operate to nullify the patent before issued. The patentee would not be a party to this proceeding; and if not, a patent of elder date, under the great seal of the Commonwealth, possessing the high dignity of record evidence of title, uncancelled or annulled, would be outstanding, presenting a continuing embarrassment upon the title of the com *550 plainant, and an incumbrance upon his peaceful possession and enjoyment of the land.
A Court of Chancery, by acting directly upon the patent, could sweep away all these embarrassments, by compelling a conveyance of the title to the improver, and in the mean time, do complete equity to the patentee, by requiring the improver to refund to him, the price he paid to the State for the title.
Johnson is equitably entitled to the land. Gresham, in fraud of the law and of the rights of Johnson, has obtained a patent from the Commonwealth. Johnson, upon doing equity to him, is entitled to the benefit of his patent. A Chancellor should decree it to him. The case, in principle, is analagous to the common case, where A holding the elder equity, is entitled to the legal title from B; and C, in fraud of his elder equity, obtains from B the legal title;, a Court of Chancery would compel him to surrender it to. A, he doing equity on his part.
It is, therefore, the opinion of this. Court, that the decree of the Circuit Court be reversed, and the cause remanded, that a decree may be entered, compelling Gresham to convey the quarter section in contest to the complainant, upon his. paying in Court, for Gresham, forty dollars in Commonwealth’s paper, or its equivalent in money, with interest; and that Gresham pay the costs. And the appellant is entitled to his costs in this Court.