JOHN WELDER ET AL. v. RUFUS CARROLL.

The entire description in a patent must be taken, and the identity of land ascertained by a reasonable construction of the language used. If there be a repugnant call, which by the other calls in the patent clearly appears to have been made through mistake, that does not make void the patent. But if the land granted be so inaccurately described as to render the identity wholly uncertain, it is admitted that the grant is void. (Paschal's Dig., Art. 5294, Note 1144.)

---

---

Where a grant called for a map, as part of the description, the map is admissible in evidence to explain and sustain the grant.

Where the map referred to is not attached to the *testimonio*, and is not an archive in the general land office, where it ought to be, in the absence of any objection to the failure to allege the loss or destruction of the original maps, or to account for their non-production, the grantee has the right to resort to secondary evidence of the contents of such maps. (Paschal's Dig., Arts. 70, 71, Notes 250, 251.)

Where the original map referred to in the grant was traced to the office of the district surveyor, a compared copy, proved by the surveyor, ought to have been submitted to the jury, and it should have been left to them to determine whether it was the same referred to in the grant or not, and if it be the same, it may be consulted to identify the land.

Such map, not being found in the public office where it belonged, could not be proved by certificate, under the 89th or 91st section of the act to regulate proceedings in the district court. (Paschal's Dig., Arts. 3715, 3717, Notes 839, 841.)

But where the map had remained in such district surveyor's office for a term of several years, and had been used by him as an archive, the sworn copy should have been admitted, without the necessity of producing the original.

If the boundaries of a survey can be ascertained and established by a resurvey, following the calls in the title and map forming a part of it, and the ancient land-marks made for its identity by the original surveyor; or if its locality can be proved by witnesses, who, from their personal knowledge, or information derived from general reputation, or from its having been pointed out to them by the surveyor by whom it was run, or by others who were present at the time or cognizant of the fact, it will fix or mark its position, although there may be a discrepency between its position thus ascertained and that given by the calls, or the plot on the grant. (Paschal's Dig., Art. 5294, Note 1144.)

Where two surveys were made at the same time, one cannot claim priority to the other merely because the final title is anterior in date, nor can the boundary of one be enlarged because the other has been declared invalid. (See the opinion for a demonstration of this principle.)

Where the calls of two surveys together exceed the quantity intended to be granted, the land is nevertheless appropriated; and, if the dividing line between them cannot be ascertained, they must hold in proportion to the respective quantities to which they are entitled; and, if there be not enough to fill both surveys, they must suffer diminution in the like proportion.

Hearsay evidence is admissible to prove ancient boundaries, but it should be closely scrutinized, and not admitted if it be vague and uncertain.

A witness who is liable to one of the parties, as a trespasser upon the land, is competent, because the judgment could not be used for or against him.

APPEAL from Victoria.   The case was tried before Hon. FIELDING JONES, one of the district judges.

The record had one hundred and twenty-five pages, which include six maps, embracing the *locus in quo* and the surrounding country.

The argument of Judge Robert Hughes for the appellants was, perhaps, the last effort of the well-stored legal mind of a man who had given his whole life to the study of the law, and the last twenty years exclusively to the practice in cases involving Texas land titles.   But the *Reporter* finds it impossible to insert it, in consequence of its great length and the illegible manuscript written on both sides.   The *Reporter* is aware that without the maps, and particularly the map "D," the description must be imperfect; but our law makes no provision for engraving maps.   The map "D" is nearly in a triangular shape, and is bounded on two sides by the streams called for.

This was an action of trespass to try title, brought by the appellee against the appellant, on the 24th September, 1853, in the district court of San Patricio county, for the recovery of two tracts of land, of three hundred and twenty acres each, situated on the south side of the river Aransas, in said county.   The venue was subsequently changed to Victoria county, and, on the 20th August, 1859, there were a trial, verdict, and judgment for the plaintiff.

The plaintiff claimed the land in controversy by virtue of two locations under an unconditional head-right certificate for six hundred and forty acres, issued to John Rosell, on the 5th June, 1843, by the board of land commissioners of Victoria county, which the defendant admitted to be genuine.

The defendants claimed by virtue of a grant to Felipe Roque Portillo, issued by the commissioner of Power & Hewitson's colony, on the 23d October, 1834, for one league of land.

The petition of the commissioner, which precedes the grant, is dated September 11, 1834, and asks for land—

"Sobre el arroyo del Aransas por aquel lado colindante con el empresario Power, por la parte de abajo."

This is translated in the record:

"On the creek of Aransas, extending on the other side with the empresario Power, by the lower part."

The translation should be—

"Upon the Aransas creek, on the other side, contiguous with the empresario Power, by the lower part."

The grant itself contains no designation or description of the land conveyed, except the following:

"I adjudge to him, in form, the league of pasture land which he has asked, a labor inclusive, which is composed of the twenty-five million of Mexican varas which the law designates, and is contained within the surveys which one of the appointed surveyors made upon the Aransas creek, on the other side or right margin, in the figure indicated by the letters A, B, C, D, E, comprehensive of seven and a half leagues, and whose particular map, authorized by me, shall be annexed to this title for the security of the party interested."

The map referred to was not annexed, and the plaintiff objected to the grant, because, first, it contained no sufficient description of the land conveyed; second, the map referred to was not annexed.

These objections were overruled by the court, and the plaintiff excepted.

To designate the land conveyed, and sustain their grant, the defendants then introduced a grant to Power & Hewitson for four and three-quarter leagues, dated November 22, 1834. The petition which precedes this grant, forming part of the testimonio, after reciting that the petitioners, Power & Hewitson, had, on the 24th December, 1829, obtained by purchase two concessions of eleven leagues each, of which they had only taken possession of seven-

teen and a quarter leagues, asks that, with respect to the
balance, there may be surveyed and adjudicated to them
"four and three-fourth leagues; two and a half below the
lands surveyed for Don Miguel Aldrete and Mr. Galvan,
on the west with the lake of Aransas, on the south with
that creek, and north by the creek of the Mission, the
other two and a quarter leagues between the Chiltipin,
Aransas, and Papilote, towards the west."

The grant itself is of "the four and three-fourth leagues
of pasture land which they asked, which, according to the
surveys made by one of the appointed surveyors, is divided
into two parts: the first composed of the two and a half
leagues situated upon the lakes, which are formed at the
termination of the creek called Aransas, and whose irregu-
lar figure appears from the particular map which shall be
annexed, being contiguous, on the northwest, to the lakes
which are formed thereabouts; on the north, a line of four
thousand eight hundred and forty-seven varas, with lands
of Galvan; on the southwest, with a line of ten thousand
eight hundred and ten varas, with the citizen Aldrete, con-
cluding, towards the south, with an enclosure or semi-circle
upon the lakes which exist thereabouts.  The second por-
tion consists of two and one-quarter leagues of marshy
pasture land: one, connected with the quarter, has a front
upon the Aransas of three thousand one hundred and
twenty-five varas, and of depth, on the lower side, nine
thousand eight hundred varas, and, on the upper, nine
thousand eight hundred and fifty; bounding on the west
with citizen Loupy; on the south with the same empresa-
rios; on the east, —————— Felipe Portillo; and on the north
with said creek; and the other remaining league has a
front upon the Chiltipin creek of one thousand Mexican
varas, and ——————· from this creek where is formed ——————
with a line to the north, with a line of five thousand eight
hundred and eighty varas; the square is closed with two
others of five thousand varas, bounding, on the north, with

XXIX.—21.

said citizen Loupy; on the west, with Daniel O'Boyle; on the south, with citizen Pollan; and on the east, with Felipe Roque Portillo."

[The dashes indicate omissions, by the copyist, of words in the original.]

The defendant then introduced a grant to Calisto, Juan, Francisco, and Encarnation Portillo, sons of Felipe Roque Portillo, for one league each, dated October 23, 1834. This also called for a particular map, which was not annexed, and the field-notes are identical with those of the grant to Felipe Roque Portillo, with the exception that the petition prefixed to this grant does not ask for land adjoining the empresario Power.

The defendant next offered a grant to Felipe and Jose Maria Portillo, for one-half a league each, dated October 23, 1834. The field-notes of this grant are identical with those of the last, and a particular map is called for, which is not annexed.

The defendant next offered a grant to Miguel Musquiz, for one league, dated October 23, 1834. This grant also calls for a particular map, which is not annexed, and the field-notes are identical with those of the last two grants. The petition, which precedes this grant, asks for land "on the Aransas, on the other side, bounding, on the west, with the Messrs. Portillos, and on the south with Chiltipin creek."

The defendant next offered a grant to Antonio Gonascochechea, which also calls for a particular map, which is not annexed, and the field-notes are identical with those of the last three grants. The petition which precedes this grant asks for land "on the Aransas creek, on the other side, contiguous with Miguel Musquiz, and on the south with Chiltipin creek."

The defendant next offered a grant to John Pollan for one league, dated October 3, 1834. This grant also calls for a particular map, which is not annexed. The field-notes are as follows:

"Composed of an irregular figure, under one line, from south to north, of five thousand Mexican varas; another with ———— varas, from south to north, equally, (*i. e.*, of equal extent,) concluding with another, from southeast to northwest, of ———— varas, contiguous, hereabouts, with vacant lands; on the west, with the league of citizen Morris; on the south, with that of citizen Malcolm; and on the west with vacant lands."

The defendant next offered a grant to Victor Loupy, for one league, dated November 26, 1834. The petition which precedes the grant states that the applicant has chosen "a league of land where the Papilote empties into the Aransas river, on the south side."

The field-notes are as follows:

"Composed of two thousand four hundred varas, front upon the Papilote creek, and of depth, on the lower side, nine thousand eight hundred and fifty varas, and on the upper, nine thousand five hundred and fifteen, contiguous, on the north, with said creek; on the west, with citizen O'Conner; on the south, with the empresario Power and citizen Boyle; and on the east, with said empresario."

Defendant next offered a grant to D. & J. O'Boyle, for one league and a quarter of land, dated November 25, 1834.

The field-notes of this grant are as follows:

"The league is contained in a square figure, contiguous to the leagues situated upon the Lake of the Cross, and with five thousand Mexican varas on every side, contiguous on the north with citizens Victor Loupy, O'Connor, and the widow Quinn and her sons; on the west, with vacant lands; on the south, with citizen Morris; and on the east, with the empresario Power. The quarter of a league is situated on Aransas creek, with a front of six hundred and twenty-five varas, and of depth nine thousand one hundred varas, contiguous on the north with the said creek; on the west, with vacant lands; on the south, in the same way and with lands

of citizen O'Brien; and on the east, with citizen Thomas Holden."

The point at issue was the boundary line between the grant of five and a half leagues issued to Power & Hewitson, on the 30th October, 1834, and the grant to Felipe Roque Portillo, for one league, issued on the 23d October, 1834. The grant to Power & Hewitson was for ten leagues, five and a half of which were located in the grant by express terms, between the Aransas and Chiltipin, commencing at the forks of those two streams, and running up for quantity. The field-notes of this tract, as set forth in this grant, are as follows:

"Five and a half leagues upon the Aransas creek, on the other side, or right margin, whose irregular figure, or as an imperfect triangle, is composed of one hundred and thirty-seven million five hundred thousand varas of superficies, contiguous on the north with said creek; on the west with lands of Felipe Roque Portillo; on the south with Chiltipin creek; and on the east where the two streams join, as the map hereto attached shows."

The grant of four and three-quarter leagues to Power & Hewitson, in two portions or parcels, is situated above the grants to Portillo and his sons, on the west side thereof, and the five and a half league grant to Power & Hewitson lies below the grants to Portillo and sons, on the east side thereof.

The appellants contended that the grant of four and three-fourths leagues to Power & Hewitson was the one referred to in the grant to Felipe Roque Portillo, and that he could define the boundaries of the Portillo grant by means of the other grants introduced in evidence, without any reference or regard to the five and a half league grant to Power & Hewitson. They also contended that if there was any conflict between the five and a half league grant and the Portillo grant, the latter should have the preference, because,

first, it is the elder title by its date; and, second, the five and a half league grant has been declared void.   Also, that the lower line of the Portillo grant had been established by the parol testimony.  On the other hand, the appellee contended that each and every grant introduced in evidence by the appellants is void for uncertainty, and he objected to them, each in turn, when offered, on that ground; that the five and a half league grant of Power & Hewitson was the one referred to in the Portillo grant; that the boundaries of the Portillo grant could not be ascertained without first fixing the boundary line between that and the five and a half league grant, all of whose boundaries, except said division line, were well-marked natural objects, being two streams of water, from their junction upwards; that the appellee is estopped from denying the validity or boundaries of the five and a half league grant by his call for that grant as a boundary; that the nullity of the five and a half league grant cannot affect the validity of the Portillo grant, where they conflict, as, however void it may be, it is good as a designation of boundary, and its nullity made the land contained within its limits vacant land, subject to location; and that the lower boundary of the Portillo grant was not proved.

*Robert Hughes*, for the appellants.

*Glass & Phillips, Jr.*, for the appellee.—"The entire description in the patent must be taken, and the identity of the land ascertained by a reasonable construction of the language used.  If there be a repugnant call, which, by the other calls in the patent, clearly appears to have been made through mistake, that does not make void the patent. But if the land granted be so inaccurately described as to render its identity wholly uncertain, it is admitted that the grant is void."  (Boardman *et al.* v. Lessee of Reed *et al.*, 6 Pet., 355.)

In the grant to Portillo, no natural boundaries were

called for.   In the absence of the map, no surveyor could ascertain the locality or even shape of the figures designated by the letters "A, B, C, D, E." In its present condition, therefore, this grant is as vague and uncertain as a grant well can be.

"Entries of land in Kentucky must have that reasonable certainty which would enable a subsequent locator, by the exercise of a due judgment and diligence, to locate his own lands on the adjacent residuum." (Bodley v. Taylor, 5 Cranch, 191; Faulkenburg v. Truesdell, 5 Strob., 221; Mesick v. Sunderland, 6 Call., 297; Mann v. Taylor, 4 Jones, 572; Ward v. Lee, 1 Bibb, 17; Craig *et al.* v. Doran *et al.*, Hard., 139; Chinoweth v. Haskell, 3 Pet., 92.)

An entry to adjoin a survey not then recorded, and without proof of notoriety, is invalid.   A call for a line which is not of record, or generally known, cannot be sustained. (Payton v. Goodlett, 1 Bibb, 63; Garnett v. Jenkins, 8 Pet., 75.)

The counsel critically argued the facts of the record. A marked line of another tract, which can be established by its memorials, when called for in a conveyance, must be returned to, disregarding distance. (Gause v. Perkins, 2 Law., 223; Ricker v. Barry, 34 Me., 116.)

Where the grant calls for the lines of an old grant, the rule is, that it must go to it, unless a natural object or marked tree is called for; and before the marks of the junior grant can be ascertained, those of the old must be located. (Dula v. McGhee, 12 Ired., 332; Johnson v. Fallow, 11 Ired., 199.)

"A letter written or a deposition made by the witness may be used as evidence to contradict his testimony, the letter or deposition being first regularly proved." (2 Phil. on Ev., 962.)

"A witness' credibility being seriously impeached by written or other plain, deliberate, contradictory statement by him, and not supported, ought, it would seem, to be

entirely rejected." (2 Phil. on Ev., 976, note 600; 3 Graham and Waterman on New Trials, 1215 and note; De Sailly v. Morgan, 2 Esp., 691; Ewer v. Ambrose, 4 B. & C., 25, [10 Eng. Com. L., 466;] Williams v. Chapman, 7 Ga., 467; Clapp v. Wilson, 5 Denio, 285; Pickard v. Collins, 23 Barb., 444.)

As he does not state that he knew this line, how could he know its direction? It is nowhere shown that the line was ever actually run, and the presumption is that it was not, from the character of the field-notes of the various grants. Carlisle's information was all derived from the surveyor, who only stated what Portillo claimed, and aside from the fact that such testimony is inadmissible, that proof cannot fix the locality and direction of the line. Power was the son-in-law of Portillo, and it is not probable that they were particular about having their division-line actually run. Nor is it probable that Power, being empresario, would allow large slices to be cut off his grants above and below, when all parties concerned could obtain their full quantity of land by beginning their surveys at the forks of the two streams, which were his own natural boundaries.

But wherever this disputed boundary line may have been, it should have been so designated on the ground by monuments or land-marks, or so recorded as to have notified innocent locators of the limits of the grant. (Guilbeau v. Mays, 15 Tex., 410.)

In the case of Smith & Preston v. Prewitt, 2 A. K. Marsh., p. 582, (marg. p. 155,) quoted by the appellant, the facts differ very materially from those of the case at bar. In that case "the corners of the exterior side line of each survey were designated on the plat, and proved to exist on the ground, in correspondence with their description in their respective patents."

In the case of Mercer *et al.* v. Bate *et al.*, 4 J. J. Marsh., 334, quoted by appellant, a number of corners and lines of

both patents were distinctly marked. Three of the corners of Mercer were indisputably established and admitted, and a number of his lines were also well defined. Two of Madison's corners were marked and admitted, and also four lines.

But see those authorities, which are really favorable to the appellee when the facts are closely examined.

MOORE, C. J.—If the original grants, or so much of them as is contained in the present record, are to be regarded as appellant's only evidence of title, it is very evident that there would be no sufficient ground for a reversal of the judgment. Standing alone, and unsupported by the production of the maps, or secondary evidence to supply their place, referred to by the commissioner and made a part of the grants for the identity and description of the land, we think, beyond dispute, the objection made by appellee to these grants, that they were void for uncertainty, should have been sustained. The only description given of the land in the titles extended by the commissioner, which was before the court, is, after designating the quantity of land granted, the statement that it is "contained within the surveys which one of the appointed surveyors made upon the Aransas creek, on the other side or right margin, in the figure indicated by the letters A, B, C, D, E, comprehending seven and a half leagues, and whose particular map, authorized by me, shall be annexed to this title for the security of the party interested." Nor is the defective description of the land, without this map, supplied by the designation of that for which the grantee asks in his petition, if it could be looked to for this purpose, which, however, cannot ordinarily be done. The petition of Felipe Roque Portillo asks merely for the land to which he was "entitled, as a married man, beyond the creek of Aransas, extending on the other side with the empresario Power, by the lower part." Evidently, therefore, in the

absence of all evidence in respect to the map referred to in the title and its contents, and there being no proof of an actual survey of the land, it cannot be said that there was any evidence before the court of a grant of the particular land here in controversy, or any other designated part of the public domain. Without this map a surveyor could neither ascertain the locality of the grant nor determine its form.

"The entire description" (as is said in Boardman v. Reed, 6 Pet., 355) "in a patent must be taken, and the identity of the land ascertained by a reasonable construction of the language used. If there be a repugnant call, which by the other calls in the patent clearly appears to have been made through mistake, that does not make void the patent. But if the land granted be so inaccurately described as to render the identity wholly uncertain, it is admitted that the grant is void. (Mesick v. Sunderland, 6 Call., 297; Mann v. Taylor, 4 Jones, 272; Faulkenburg v. Truesdell, 5 Strob., 221.)

To have been consistent with its own ruling, therefore, in excluding the evidence upon which the appellants relied to identify the grants by the map, which they claim was made contemporaneously with the titles, the court should have held the grants void.

The material question in the case for our determination, therefore, is, whether the evidence to supply the map upon which appellants relied to identify the land should have been excluded; for as it has not, and certainly could not plausibly be, insisted that, if the title were accompanied by a map designating and describing the land with sufficient certainty, it would not be as valid and effectual as if such description were given in the body of the title, the mere fact that the grants are void, without the evidence which was sought to be supplied, is unimportant, if the court erroneously excluded it when offered.

The presumption in favor of the regularity of their acts

and the proper discharge of their duties by the officers
from whom these grants emanate and these maps should
have been made, and the well-known custom in that sec-
tion of country of thus designating and describing lands,
fully justify and sustain the conclusion, that the grants
under which the appellants claim are accompanied by maps
properly and sufficiently describing the land to which the
grantees are entitled. And as they are not now found
within the titles, and are not in the general land office,
their proper place of deposit, the length of time since these
grants are made, the many mutations through which the
country has passed since their date, and many incidents of
destruction and loss to which both public and private records
and muniments of title have been subject, especially in the
section of country in which this land is situated, authorized
appellee, especially in the absence of an objection of his
failure to allege the loss or destruction of the original
maps, or to account for their non-production, to resort to
secondary evidence of their contents. And we are of
opinion, in view of the circumstances of the case, that the
evidence offered by the appellants for this purpose should
have been received. It must be inferred from the grants
that an actual survey, or a platted one on a descriptive map,
was made of these lands by Loupy, the surveyor for this
part of the colony, at the date of the grants, and that such
map was before the commissioner, and that he recognized
its sufficiency for the purpose for which it was made, and
ordered it, or copies of it, to be attached to the several
grants, as part of the evidence of the titles of the interested
parties. The map upon which appellants rely was made
by Loupy, the surveyor. It is of the same date with titles
under which they claimed. The indorsement upon it, in
the handwriting of the commissioner, of the word "*con-
cerido*," leads to the conclusion that it was examined, ap-
proved, and acted upon by him. It shows upon its face,
and by the notes of the surveyor, that it was made for the

purpose of a grant of land to the parties through whom the appellants deraign their title. The diagram of the survey is marked with the letters mentioned in the grants as descriptive of the figure of the survey to which they refer.

These coincidences between this map and the one which should have been with the grants are quite sufficient to authorize the original map, now in the office of the district surveyor of Nueces county, to go to the jury, with the evidence adduced of its authenticity, for their determination, as a question of fact, whether it was either the map itself which accompanied the original grants or the original office plat, from which copies to go with such titles were to be taken; for if it be the latter, there is no doubt it may be resorted to, in the absence of the originals accompanying the grants, as evidence of the identity and boundaries of the survey. (Alexander v. Liveley, 5 Monr., 161; Mercer v. Bate, 4 J. J. Marsh., 339.)

Although it is true that if this map was either the original office plat by Loupy, the surveyor, or one which accompanied the grants, it is not, strictly speaking, now found in its proper place of deposit, and therefore appellants are not entitled to make evidence by a certified copy of it. But as it was shown to have been recognized and treated for a number of years, by the officers in whose custody it was, as pertaining to the records of their office, and as the same facts in reference to it were established, which would have been necessary if it had been brought before the court, and as no good purpose, it seems, would have been subserved by bringing it from another county by a *subpœna duces tecum*, we think the examined copy, proved to be a *fac simile* of the original, should have been received.

The exclusion of this evidence requires a reversal of the judgment; but after it is admitted the question still must be determined what land is embraced in the grants under which appellants claim, and how must the boundaries and

extent of their survey be defined and ascertained. The material point in controversy between the parties to the present suit, is to fix the eastern boundary line of the seven and a half league survey to which appellants deraign title, and by which it is separated from the five and a half league tract in the name of Power & Hewitson. It is contended by appellees, and held by the court below, that as Portillo asks in his petition for lands bounded by the upper or western line of the empresario Power, by which reference is evidently made to this survey for the empresarios Power & Hewitson, for five and a half leagues, and although the Portillo grant is the elder title, it must commence on the western boundary of a survey of five and a half leagues, commencing at the junction of the Aransas and Chiltipin creeks, and up and between said streams, for quantity. On the other hand, appellants insist that they are entitled to fix the western boundary of the seven and a half league survey by ascertaining the boundaries of other grants which call to bound on it, and from the initial point thus ascertained to run down the Aransas for quantity, and thus determine the eastern line of their survey, although there may remain less than the *quantum* of land called for in the Power & Hewitson grant between such line and the junction of said streams, for the reason, as appellants say, that theirs is the oldest title, and that the other was a void and illegal grant.

In neither of these positions can we concur. The question for determination is neither the locality nor quantity of land to which either of the parties securing these several grants may have been entitled, but what amount of land was in fact granted to them, and what are its boundaries and limits? And if these are not in fact marked and defined by actual survey, where does the law fix and define them?

If the boundary line between these surveys was run out and marked upon the ground, and it can be ascertained

and established by a re-survey, following the calls in the
title and map forming a part of it and the ancient land-
marks made for its identity by the original surveyor; or,
if its locality can be proved by witnesses who can, from
their personal knowledge, or on information derived from
general reputation, or from its having been pointed out to
them by the surveyor by whom it was run, or others who
were present at the time or cognizant of the fact, (Stroud
v. Springfield, Austin term, 1866,) [28 Tex., 649,] this
will fix and mark its position, although there may be a
discrepancy between its position thus ascertained and
that given it by the calls or plat on the grant.   But if it
cannot be thus established, it must be fixed where it is
placed by survey of the land, made in conformity with the
well known rules by which a re-survey in such cases must
be controlled.

The map, which is our only guide in finding the bound-
aries of the land which appellants claim, shows on its face
that it was intended also as a descriptive plat and survey
of the five and a half league tract for Power & Hewitson.
The two surveys, therefore, must be treated as contempo-
raneous.   Neither can claim any advantage over the other
from the mere priority in the date of the final title.   Nor
can the boundary of one be enlarged by reason of the other
being pronounced invalid by the courts years afterwards, if
we could consider that matter in the present record.   There
appears, from an inspection of the map, no difficulty in
ascertaining and laying down the external lines of the two
surveys.   The difficulty is in locating the dividing line
between them, arising from the fact that there is not suffi-
cient land contained within the external lines to satisfy
the claims of both.   In describing the seven and a half
league survey, the division line is indicated by the letters
C D, while in the triangular figure referred to, to designate
the Power & Hewitson tract, the same line is called for by
the letters C K.   Yet an inspection of the map shows two

parallel lines with these three letters. It cannot, therefore, be certainly told from the map which of these lines was intended by the surveyor as the divisional line.

If this line was in fact run out by the surveyor, it would, we think, be more reasonable to suppose that he has reference to the western of the two lines, as there would seem to be no difficulty, from the map and the notes of survey appended to it, in fixing this line upon the ground, while it does not seem possible to do so with the other. But from the fact that the Power & Hewitson tract is described in the notes upon the map by reference to the triangular figure said to be marked upon it, and the eastern of these two lines forms, in connection with other lines marked upon the map, nearly a triangle, we conclude that it must be the line intended by the surveyor to represent the boundary between the two tracts. The line, we think, was most badly, in fact never, run upon the ground, but was placed upon the map where, by a calculation from the surveys actually made, and the supposed meanders of the two streams by which the lands are bounded, the line should be found. But, although the map leaves it uncertain which of the two lines, marked C, K, D, is the boundary between the surveys, or if, in fact, no such line was run or designated by the surveyor, the validity of the grants is not thereby impaired. It becomes necessary in such case that the line shall be determined by other calls. They are required to bound mutually on each other; as we have said, neither is entitled to a preference. The external lines of the two surveys can, no doubt, be easily ascertained. Within these lines the different grants call for thirteen leagues of land. If there be an excess in the quantity of land within these lines, it is, nevertheless, appropriated and covered by the grants, and should be shared between them in proportion to the respective amounts to which they are mutually entitled. And, on the other hand, if there be not sufficient to satisfy both surveys, the diminu-

tion must be borne by them in the same proportion. (Johnson v. Gresham, 5 Dana, 543; Smith v. Prewitt, 2 Marsh., 157.)

The objection to the deposition of the witness, Carlisle, tending to prove the locality of the boundary line from information given him by a surveyor, should have been sustained.    While, as has been heretofore held by this court, hearsay evidence to establish ancient boundaries is, under proper circumstances, admissible, (Stroud v. Springfield, *supra*,) [28 Tex., 649,] it should be closely scrutinized, and received with proper caution.    The evidence here proposed was much too vague and uncertain in respect to the locality of the line of which the witness speaks, as well as in respect to the source of his information, and the time and circumstances under which he acquired it.

The objection to the witness, Carroll, was properly overruled.    He does not appear to have any legal interest in the result of the suit.    Although liable to the appellants as a trespasser, if they are the owners of the land, the judgment in this case can be used as evidence neither for nor against him.

The judgment is reversed, and the cause

REMANDED.