## D. H. PERRY ESTATE v. FORD.

No. 2703.   Decided July 15, 1915.   (151 Pac. 59.)

1. BOUNDARIES—AGREED BOUNDARIES—WHAT CONSTITUTES. In a suit
to restrain trespass on land, evidence *held* insufficient to show
that plaintiff was entitled to the property in controversy by rea-
son of a boundary line by acquiescence.[1]   (Page 452.)

2. ADVERSE POSSESSION—ADVERSE HOLDING—WHAT CONSTITUTES.
Possession of land only by leaving vehicles there and occasion-
ally depositing refuse is not such possession as will ripen into
title.   (Page 452.)

3. APPEAL AND ERROR—DETERMINATION—REVERSAL. Where the evi-
dence in support of plaintiff's pleaded title was insufficient to
support judgment in its favor, and there were no findings on
defendant's claim of adverse possession, which was not estab-
lished by the evidence, judgment for plaintiff should be reversed,
the cause remanded, and the parties given leave to amend.
(Page 452.)

McCarty, J., dissenting in part.

Appeal from District Court, Second District; *Hon. J. A. Howell,* Judge.

Action by the D. H. Perry Estate against Rufus Ford.

Judgment for plaintiff. Defendant appeals.

REVERSED and remanded.

*T. D. Johnson* and *Wade M. Johnson,* for appellant.

*C. C. Richards* and *John G. Willis,* for respondent.

FRICK, J.

The plaintiff, a corporation, in July, 1913, commenced this
action against the defendant to restrain him from trespassing
upon a certain strip of ground claimed by it as owner, and,

---

[1]*Holmes* v. *Judge,* 31 Utah, 269, 87 Pac. 1009; *Binford* v. *Eccles,* 41
Utah, 453, 126 Pac. 333; *Tanner* v. *Stratton,* 44 Utah, 253, 139 Pac.
940.

in addition to the injunction prayed for, also asked for general relief.

In the complaint plaintiff's land is described as follows:

"Beginning at the northeast corner of lot No. 9 in block 25, plat A, Ogden City survey; thence south 76 feet; thence west 301.65 feet; thence north 76 feet; thence east to the place of beginning. Together with a strip of land on the north side of said lot bounded and described as follows: Beginning at said northeast corner of said lot No. 9 in said block 25, plat A, thence west 301.65 feet; thence north 2.6 feet; thence east 301.65 feet; thence south to the place of beginning."

The only portion of the land just described that is in question in this action is a small strip 88 feet in length by 2.6 feet in width, and is indicated on the following plat by "c c":

The plaintiff claimed ownership of the strip by reason of an agreed or implied boundary line, and also as surplus ground. The defendant denied plaintiff's ownership and possession and right of possession, and claimed title to the strip both by conveyance and by adverse possession under our statute.

The land described by the defendant as owned by him is as follows:

"Beginning at a point 10 rods and 6 feet west and 198 feet ℘ south from the northeast corner of lot 7 in block 25, plat A, Ogden City survey, according to the monuments of Ogden City as now established, and running thence west 88 feet; thence south 68.6 feet; thence east 88 feet; thence north 68.6 feet to the place of beginning."

The court found the issues in favor of the plaintiff; that is, the court found that plaintiff was the owner of the strip in dispute both by reason that it was surplus ground and because of an agreed or implied and established boundary line. The court did not directly find upon the defendant's claim of adverse possession. Upon the findings the court made conclusions of law, and entered a decree in which it was "ordered, adjudged, and decreed" that the plaintiff "do have and recover from   *   *   *   the defendant the possession" of the strip of land which we have marked "c c" on the plat, and further perpetually enjoined defendant from in any way interfering with plaintiff's possession and enjoyment of said strip of ground or any part thereof.

The defendant appeals, and assails the findings and judgment as being contrary to the weight of, if not entirely unsupported by, the evidence.

Plaintiff's counsel contend that the assigments are not sufficiently specific to authorize us to review them. We think otherwise. The assignments point out as well as that may be done within the limits of a general assignment in what particulars the defendant claims the evidence to be insufficient to sustain the findings, and also point out in what other respects it is claimed the court erred in making findings or in omitting to do so. Plaintiff's counsel, with considerable vigor, further contend that this action comes within the rule of the so-called boundary line cases decided by this court, namely, *Holmes* v. *Judge*, 31 Utah, 269, 87 Pac. 1009; *Binford* v. *Eccles*, 41 Utah, 453, 126 Pac. 333, and cases there cited; and *Tanner* v. *Stratton*, 44 Utah, 253, 139 Pac. 940. *Holmes* v. *Judge* seems to have been the first of that class of cases, and *Tanner* v. *Stratton* is the last one. It is insisted that the facts bring

this case within the rule laid down in *Binford* v. *Eccles, supra.*
We cannot yield assent to the contention. Nor do the facts
bring it within any of the so-called boundary line cases. In
our judgment, there is a very wide distinction between what
controlled in *Binford* v. *Eccles* and other like cases and the
case at bar. In all of those cases the evidence was reasonably
clear and convincing that the parties in interest had intended
the fences or other structures in question there as being placed
upon the boundary line, and that the parties mutually recog-
nized, or at least for so long a term of years acquiesced in
treating, such fences and structures as marking the boundary
line of the adjoining lands or lots there in question as to
authorize a finding that the boundary lines were established
by agreement either express or implied. The case of *Binford*
v. *Eccles* is an example upon that point. In that case we think
the facts clearly establish what we have just said. We quote
only a portion of the facts which controlled in that case as
found on page 456 of 41 Utah, on page 334 or 126 Pac.:

"The evidence is undisputed that the ground claimed by both par-
ties to this action at one time was owned by one and the same owner;
that approximately twenty-five years before the appellant became
the owner of the land now claimed by him the prior owner sold a
parcel of ground off the east side of his ground to one of appellant's
predecessors in title, and after having sold and conveyed the same
the predecessor aforesaid desired an additional three-foot strip along
the west side of the parcel before purchased by him, which the owner
sold and conveyed to him; that after such conveyances the purchaser
of said strip erected a substantial fence along the west boundary
line of said strip; that said fence from thenceforward for approxi-
mately twenty-five years before appellant became the owner of the
parcel of land purchased as aforesaid from the original owner was
always recognized and maintained as the boundary line between the
parcels of land, one of which is claimed by respondent, and the other
by appellant; that during the time aforesaid said fence at times re-
quired repairing and replacing, which was always done when neces-
sary by the owners of the parcels of land lying on either side of the
strip by each owner contributing his proportion of the cost of repairs
or maintenance."

The only fact that is common to both *Binford* v. *Eccles* and
this case is that there is a surplus in the block, which to some
extent increased the size of the lots.

Let us examine a few of the controlling facts of this case. By referring to the plat and the record title we find that the predecessor of plaintiff obtained title to the following parcel of ground, namely: Beginning at the northeast corner of lot 9, which is the point marked "d" on the plat; thence south 76 feet; thence west 330 feet; thence north 76 feet; thence east 330 feet to the place of beginning. The plaintiff claims by precisely the same description. The parcel is marked P on the plat. This is the description given both in the deed and in the decree of distribution. It will be noticed that in the plat the length is given as 301.65 feet. The difference arises for the reason that on the west end of lot 9 a strip approximately thirty feet in width was taken off for a street. This, it seems, was done after plaintiff became the owner. That, however, is not material. Plaintiff therefore owns a parcel of land in lot 9, according to the record title, which is 76x301.65 feet. Now, in addition to this, the Probate Court distributed to the plaintiff a strip of ground described in the decree as follows:

"Also a part of lot 8 in block 25, plat A, of Ogden City survey, Weber county, Utah, commencing at the southeast corner of said lot 8; running thence west 10 rods; thence north 2½ feet; thence east 10 rods; thence south 2½ feet to the place of beginning."

This description thus again begins at the point marked "d" on the plat, and describes the strip which is marked "10R," "e e" on the plat. The source of title to this strip is not shown. Whether it was acquired by conveyance, adverse possession, or otherwise is not made to appear. The only real importance to these descriptions in this case is that, while the deed describing the parcel of 76x330 feet was obtained in 1870, and the decree of distribution was made in 1903, yet both the deed and the decree of distribution recognized the north line of lot 9 and the south line of lot 8 as being coterminous and that the starting point of the two descriptions is identical. From this it is also clear that plaintiff has always claimed the full 76 feet, that being the quantity described in the deed of 1870, in lot 9, and now not only claims the strip marked "e e" as described in the decree

of distribution as being 10 rods by 2½ feet, but claims a strip 301.65 feet in length by 2.6 feet in width. It was made to appear that a building was erected on the parcel of ground marked X on the plat, but whether that building was erected to conform to the building marked B on the plat, or whether the latter was erected to conform to the former, is not made clear. The building marked B was erected in 1881, and from the evidence it seems quite probable that at that time there was a building of some kind used for business purposes on the parcel marked X. But, be that as it may, we are not, nor was the defendant, concerned with the buildings that were constructed or the improvements that were made on premises to which he and his predecessors in interest were all strangers, and where neither had any right to speak or interfere in case anything was done with those premises.

We shall now consider the grounds upon which plaintiff bases its claims to the strip in controversy. The defendant deraigned title from one Lorin Farr. Farr, it seems, owned the strip of ground, with other ground, west of the alley marked "a a" on the plat. The ground owned by Farr extended south across lots 7 and 8 to the supposed north boundary line of lot 9. About the year 1880, or perhaps a year later, the sons of Lorin Farr, who were business partners, leased the strip of ground from their father, and at that time erected the shed, marked S on the plat. This shed was about 25 feet north and south by approximately 84 feet east and west, and was erected to store machinery and farm implements. The rear or south end, marked by the dotted line on the plat, was constructed about 6 feet high by setting cedar posts into the ground. The front part of the shed was about 10 feet high, and the whole was boarded up, including the south end, with boards with the roof slanting to the south, the rafters of which, the testimony showed, extended beyond the south wall from "6 inches to 3 feet." One of the Farrs who helped to construct the shed, after fully describing its purpose and construction, testified as follows:

"Q. Did you and your firm (Farr Bros.) in constructing this shed construct it with respect to where the line might be, or did you know where the line was? A. Why, we put the

shed up there. We drew a line, and thought that that would
be on our ground. We were not particular as to the line,
because it was only a temporary shed. We just put it there
for the time being. Q. And for your own convenience? A.
For our own convenience. Q. And your father had nothing
to do with it? A. No.''

The witness also testified that he and his brothers obtained
consent from their father to erect the shed; ''that he (the
father) knew that it was constructed, whether he knew they
were right on the property or not.'' There was also some
evidence that at one time there were wires fastened to the
posts along the south end of the shed. The only inference,
however, that the south end of the shed was intended as a
fence was the fact that it was constructed with cedar fence
posts, and that at one time, as the witness said, he saw some
wires strung along those posts. The witness, however, ad-
mitted that even then the posts constituted a part of the shed,
and that the same was being used for storage purposes. A
careful reading of all of the evidence, which we cannot pause
here to be set forth in detail, convinces us that neither the
posts nor the shed were placed for the purpose of marking
a boundary line; nor were they maintained or recognized for
that purpose. Farr's testimony regarding the purpose for
which the shed was erected, and how it came to be placed
where it was, stands undisputed. Indeed, there is no evi-
dence which, under the circumstances of this case, would
warrant a finding that the shed was ever intended as marking
the boundary line between lots 8 and 9, or any part of that
line. True it is that a witness who was a joint owner of the
property for about five years prior to 1899, when defendant
purchased it, testified that he made no claim to any part of
the property lying south of the shed. This witness was, how-
ever, very frank in stating that he did not know where the
boundary line was, but assumed the south end of the shed to
be the south end of their property. The evidence also without
conflict showed that a portion of plaintiff's parcel, as well as
the remainder of lot 9 lying immediately south and in the
rear of the shed, was open ground not used by any particular
person or persons, but was at times used by farmers to

hitch and feed their teams on. To hold that under such circumstances the shed in question constituted an agreed or implied boundary line would, in our judgment, constitute a very dangerous precedent, and, instead of lessening and settling disputes and preventing unnecessary litigation, which is one of the prime elements in all boundary line cases, it would result in creating and multiplying them. Fences, when constructed along the outer boundaries of lands or lots, usually are intended to mark the boundary lines of coterminous owners, and, in the absence of strong countervailing proof, may be regarded as having been placed upon the ground for that purpose; and, when such fences are acquiesced in and recognized as marking the boundary for a long term of years, an agreed boundary may well be implied. But sheds, outhouses, and other like structures, and especially temporary ones, placed on land, and more particularly so when placed by tenants, as every one knows, are not intended to mark boundary lines; and, while they may be placed on the line, their purpose, ordinarily at least, is not to indicate the boundary. To hold otherwise is diametrically opposed to the common knowledge and experience of all men. While we do not wish to be understood as holding that even temporary structures may not be placed so as to make a boundary line, yet, where such is claimed to be the case by an adjoining owner, the evidence should be clear and convincing that such a structure was erected to mark the boundary. Courts should be slow, therefore, to adopt a rule the enforcement of which might result in almost incalculable mischief.

There is, however, another phase of the case which plaintiff's counsel contend has a controlling influence upon the decision. The evidence without dispute shows that the official call in defendant's deed is the northeast corner of lot 7 at the point marked "G" on the plat. Defendant's description thus starts 10 rods and 6 feet west (a point about the center of the alley "a a") and 198 feet south from the point "G," running thence west 88 feet; thence south 66 feet; thence east 88 feet; thence north 66 feet to the place of beginning. The land just described is marked F on the plat. The beginning of this parcel is therefore 198 feet south from the north line

of lot 7, and when the 198 feet are added to the 66 feet, the width of the parcel, it evidently was thought that it would bring the south line of the parcel which was intended to be conveyed to the defendant to the south line of lot 8, which is indicated by the black line between lots 8 and 9 on the plat. That such would be the result was evidently assumed by the parties in interest, for the reason that it was further assumed that block 25 was a square of 660x660 feet, and hence each one of the five lots into which each half block was divided would have a frontage of precisely 132 feet. The distance across lots 7 and 8, it was thus assumed, would be 264 feet; that is, 198 plus 66 feet, which would be 264 feet, the distance given. It, however, developed that block 25 had a surplus of over 7 feet, and thus each lot was given a frontage of approximately 133.5 feet. The foregoing distances are taken from the plaintiff's map, although there it was made to appear the distance was not quite 133.5 feet, but we have stated it in round numbers to be that. Now, the fact that defendant's deed only called for 66 feet north and south, and because of the existing surplus to which the several lots were entitled, constitutes another ground upon which plaintiff bases its claim to the strip in question. We have already seen that plaintiff's claim to the strip upon the ground of an agreed or implied boundary line cannot prevail, and therefore the question arises whether its claim to the strip upon the ground of surplus land can be sustained. We are clearly of the opinion that this claim must likewise fail. The plaintiff, so far as its claim is concerned, has permanently fixed the boundary line between lots 8 and 9, as indicated by the black line in the plat indicating the boundary line between those two lots. It claims 76 feet, no more, no less, south of the north boundary line of lot 9. It therefore claims all its deed calls for as lying within the boundaries of said lot. In addition to what its deed calls for, however, it claims 2.6 feet in lot 8. Now, the surplus of lot 9, assuming the 76 feet owned by plaintiff is entitled to all of the surplus, according to its own evidence, amounts to only a little less than 1.5 feet. If this surplus, therefore, were claimed as a part of the surplus of lot 9, which it is not, the claim could only extend to 1.5 feet. But 76

feet out of 132 feet is less than three-fifths of the whole, and hence plaintiff would, at most, be entitled to three-fifths of 1.5 feet, which would be less than one foot. But even this is upon the assumption that plaintiff can claim a surplus in lot 8. It would seem that, inasmuch as its entire 76 feet is in lot 9, it cannot claim any surplus in lot 8, whatever that surplus may be. The rule respecting surplus ground evolved by the courts is to the effect that in case a block is divided into lots, each one of which is stated to have a given number of feet, and it develops that the block contains more feet than is contained in all the lots when added together, then in such case the excess or surplus ground is divided or apportioned among all of the lots in proportion to the dimensions of each. *Pereles* v. *Magoon,* 78 Wis. 27, 46 Pac. 1047, 23 Am. St. Rep. 389; *Welder* v. *Carroll,* 29 Tex. 317-335; *McAlpine* v. *Reicheneker,* 27 Kan. 257-264. As indicated on the plat, the surplus of lot 9 must therefore all be south and none to the north of the boundary line between lots 8 and 9. Whether a purchaser of a specific number of feet of an original lot may claim his proportion of the surplus we leave undetermined. If, however, such a purchaser may claim his proportion of the surplus, then, under the facts and circumstances of this case, it is the defendant, and not the plaintiff, who is entitled to at least a portion of the surplus allotted to lot 8, a portion of which defendant purchased. Plaintiff's claim to the strip upon the ground of surplus is no stronger, therefore, than its claim of an agreed or implied boundary line. So far as we can discover, plaintiff's claim to the strip is, to a large extent at least, grounded upon the fact that, because it has succeeded in maintaining its claim to the strip lying north of the boundary line of lot 9 and east of the alley marked "a a" on the plat, therefore it should also succeed in maintaining it to the portion of the strip lying west of the alley. It must be manifest to all, however, that the circumstances, conditions, and ownership forbid that the same rule which may have obtained east of the alley can control west of it. If from all the facts and circumstances it be assumed, therefore, that the defendant has no record title to the strip in question, yet it is very clear that the plaintiff has none, and for the reasons already made

to appear the defendant's claim to the strip in any event is superior to the plaintiff's claim.

We think, furthermore, that, at least as against the claims of the plaintiff, the defendant has established his claim to the strip in question by adverse possession under our statute. Upon that phase of the case the evidence is undisputed that the defendant purchased the property in 1899; that he went into possession of it at that time and immediately had a survey made, and his south line was then located along the south boundary line of lot 8 as indicated on the plat; that he cut a door through the south end of the shed, and during all of the time from 1900 to 1914, inclusive, had used the shed as a stable for his horses, taking them through the door; that the parcel of land from 1900 to 1914, when the case was tried, had been assessed as a parcel of ground 84x68.2 feet. Apparently the reason why the length of the parcel was fixed at 84 rather than 88 feet was because a portion of it was in the alley marked "a a." In the assessment rolls, as appears from the bill of exceptions, this parcel of land during all of the years aforesaid was described as "beginning 77 feet west from the southeast corner of lot 8, block 25," thence "west 84 feet, north 68.2 feet, east 84 feet, south 68.2 feet to beginning." In the tax receipts the description was less specific. The defendant proved that from 1900 to 1913, inclusive, he had paid all taxes assessed against said parcel; that during all of those years he had no other land in the block; and that he had always claimed the whole of it as his own. Some contention was made at the trial, and the trial court seemed somewhat in doubt respecting the sufficiency of the description of this parcel in the tax rolls and receipts. Assuming, without deciding, that upon an attack by one who had paid the taxes, and who claimed the land under a tax title, the description was vague and uncertain, yet, in view of defendant's continuous possession, and for the purpose of warding off an attack by one who had no semblance of title, the description in both the tax rolls and in the tax receipts, in our judgment, was sufficient. If it were assumed, therefore, that, as against one who held the legal record title defendant's claim of adverse possession, for the reasons mentioned by the trial court,

were not absolutely conclusive, yet, as against a claimant with no better rights than the plaintiff had, defendant's claim of adverse possession should prevail. The trial court therefore also erred in not finding for the defendant upon this ground.

Since writing the foregoing my Associate Mr. Justice Mc-Carty has handed me his dissenting opinion. In view that he has apparently misconceived the theory upon which the case was originally commenced and tried, and upon which I have attempted to dispose of this appeal, it becomes necessary for me to more fully call attention to some of what I consider the controlling features of the case, all of which constitute a part of the record. I have deemed it fairer to my Associate to add what I have to say to my former opinion in this form, rather than to rewrite that opinion, since the dissenting opinion perhaps is, at all events may be, largely based upon what I said therein.

In my judgment, my Associate has entirely overlooked the groundwork of plaintiff's claim as the same is reflected from the allegations of its complaint and the evidence adduced in support thereof. In order to avoid a misconception of the precise claim of the plaintiff, I, in my opinion, gave the description of the property claimed by the plaintiff in the precise words that the same is stated in its complaint. In that description the plaintiff claims 76 feet in lot 9 and 2.6 feet in lot 8 of block 25. Its proof showed that it had obtained a deed "beginning at the northeast corner of said lot 9; thence 76 feet south; thence west," etc., to the place of beginning. The proof further showed that on the 23d day of September, 1903, the District Court of Weber County, sitting as a Probate Court under our statute, duly distributed to the plaintiff a strip of ground 2.5 feet wide by 10 rods in length, running east and west, which strip constitutes all that portion of the 2.6-foot strip described in the complaint which lies east of the alley adjoining defendant's property on the east. The strip is marked "e e" on the above plat. The plaintiff thus not only alleged, but proved, that the strip in question was wholly north of the north boundary line of lot 8, and not, as is now contended by my Associate, that said strip formed a part of lot 9. Moreover, the plaintiff introduced two maps

or plats on which the boundary lines of lots 8 and 9 are precisely as I have indicated them on the plat appended to my opinion and to which I again refer. Indeed, that plat, with the exception of immaterial details, is a miniature of a map on which are given the official surveys which both parties conceded at the hearing correctly designated the lot line between lots 8 and 9. Neither party contended at the trial, and neither of them asserts in this court, that plaintiff's land was all in lot 9, nor that the north boundary line of said lot extended north to the south end of the shed which is indicated by the dotted line on the plat, but they both insisted that at least 2.6 feet of what plaintiff claimed was north of lot 9 and in lot 8. The most that was claimed by the plaintiff in that regard was that the defendant and his predecessors in interest in erecting the shed had established the south boundary line of defendant's ground, and, hence, under our former decisions, he was estopped from disputing the boundary as established by the south side of said shed. That was plaintiff's contention in the court below, and it is its contention in this court, except that it claims, in addition, that it is entitled to its share of the surplus ground in block 25, as I have pointed out in the opinion. How is all this met in the dissenting opinion? It is met by having recourse to the abstract of title which was made by some one in 1899, and which for the purpose of showing how defendant deraigned title, was introduced in evidence by him, but was not offered for the purpose of showing the boundary lines between any of the lots. Indeed, neither of the parties claimed or claims any such purpose for the abstract. In making that abstract the abstractor, or some one else, it is immaterial who, for his own purpose or otherwise, made a pencil sketch of the whole of block 25, including therein all of lot lines from lot 1 to 10 as the abstractor thought they were or as he assumed them to be. Now, my Associate adopts that sketch as his plat, and argues therefrom that the north boundary line of lot 9 always was, and now is, 2.6 feet north of where both the plaintiff and defendant in their pleadings, by their evidence, in the court below claimed, and in this court claim, it to be. In order not to bind the plaintiff by the official map which I have repro-

duced in the plat, or for some other reason, my Associate says it was introduced by the defendant. In this he is mistaken. The reporter's indorsement and signature on the back of the map in question show that it was introduced in evidence as "Pltffs. Exhibit B on Cross-Exam.," and there is no indorsement on the exhibit that it was offered or introduced by the defendant. It is true, however, that the defendant, both at the hearing, and, it seems, at the trial, approved and adopted the map; but the plaintiff did so likewise, and, in addition, produced an enlarged map on which the lot lines are given precisely as they are given upon what my Associate designates as defendant's map of plat. The only difference between the two maps is that in the enlarged one the frontage of lots 7, 8, and 9 is given as 333.474 each, while in the other one it is given in round numbers as 333.5, but in which map the north boundary line of lot 9 is given as 2.6 feet south of the south side of defendant's shed. I assert that it is beyond any possibility of dispute that both parties claimed that the plaintiff owned 76x301.65 feet in lot 9, and that it also claimed that it owned 2.6x301.65 feet in lot 8, which claim the defendant disputed to the extent that it only owned that portion of said 2.6-foot strip in lot 8 which lies east of the alley adjoining defendant's property on the east, and that the plaintiff had no right in or title to the remainder of said strip. The plaintiff relied upon a decree of court for title to the 2.6-foot strip lying east of the alley, and introduced the same in evidence. My Associate, however, refuses to recognize that decree seriously as evidence of title, and insists "that the decree of distribution of the land in dispute was had merely as a matter of precaution," etc. While the statement affords an easy method of establishing the claim that the abstractor's pencil sketch correctly marks the boundary line between lots 8 and 9, it nevertheless leaves the plaintiff in a dilemma. As before pointed out, plaintiff's description commenced at the northeast corner of lot 9, and runs thence south 76 feet. no more, no less. If, therefore, the north boundary line of lot 9 is forced north so as to include the 2.6-foot strip covered by the decree of distribution, the 76 feet to which the plaintiff is entitled in lot 9 falls short of covering all that it

Vol 46—29

claims to the south of the north line of lot 9. Counsel for plaintiff appreciated this fact when they laid claim to the frontage of 76 feet, plus 2.6 feet. They saw that plaintiff under its deed could only claim title to 76 feet in lot 9, and therefore must claim the remaining 2.6 feet in lot 8, just as the District Court adjudged in the decree of distribution. Counsel were required to protect a frontage of 76 plus 2.6 feet, and by following the abstractor's sketch they would fall short just the 2.6 feet covered by the decree. While forcing the north boundary line of lot 9 north may thus be useful in vindicating or settling one aspect of the case, it utterly fails to square with the real contentions of the parties or with the actual situation as it appears upon the ground. In view of what I have already said, I need not pause to show that the decree in fact covered no part of the land "in dispute."

Then, again, my Associate seeks to dispose of the question of surplus ground by contending that the parties are bound by established lines, regardless of whether there is any surplus or not, etc. That, under certain circumstances, no doubt is the law, but parties have the right to consider the surplus if they so desire, and when that is done by mutual consent, as is the case here, courts have no right to ignore the agreements or concessions of the parties in that regard. It may well be that the surplus in lots 8 and 9 is adjusted to the satisfaction of all of the interested parties, but if it is not satisfactory to all the question should not be attempted to be settled by this court until some one in interest complains. The plaintiff evidently is satisfied to have the north boundary line of lot 9 and the south boundary line of lot 8 remain just where it is shown to be upon its map and on the plat appended to this opinion, and so, apparently, is the defendant. Those two are the only parties before us, and we have no right to disturb that line for the mere purpose of arriving at a result which would be more satisfactory to us, and thus, to say the least, create uncertainty and possibly turmoil among coterminous owners. In this case, therefore, the plaintiff asserted ownership of land lying in both lots 8 and 9, and the defendant acquiesced in that asser-

tion in so far as the 2.6 feet by 10 rods is concerned, but no farther, and I think that this court is also required to acquiesce. The plaintiff, therefore, contends: (1) That the defendant had established the south boundary line of his property, and thus was bound thereby; and (2) that, if the first claim was not established, it nevertheless was the owner of the land up to the south side of defendant's shed by reason of the surplus ground in block 25. As I view it, while the plaintiff had at least some ground upon which to base its claim that the defendant and his predecessors in title had established the south boundary line of his land at the south end of his shed, yet it had nothing whatever upon which to base its claim that it was entitled to the strip as surplus ground. Nor is there anything in the pleadings or in the evidence upon which a claim can reasonably be made that the north boundary line of lot 9 is north of the distributed strip of ground. As I said in my opinion, while the evidence upon the question of adverse possession is not strong, yet, so far as the payment of taxes is concerned, it is complete, and therefore strong enough to ward off the aggressions of the plaintiff, which, under the evidence, has shown no right to the disputed strip whatever.

Since writing the foregoing, Mr. Chief Justice STRAUP has written a concurring opinion in which, while concurring with the writer in the main propositions, he nevertheless thinks the case should be remanded for a new trial for the reasons by him stated. While I am still of the opinion that as against the claims of the plaintiff the defendant should prevail, yet, in deference to the opinion of the Chief Justice, I feel constrained to yield that point. I yield, however, only for the reasons stated by Mr. Chief Justice STRAUP, and not for the reasons now suggested by Mr. Justice McCARTY that there may be a variance between the proof and the allegations of the complaint respecting the description of the property. The proof could not have more strictly followed the allegations of the complaint than it does in this case so far as the description of the property is concerned. I yield because there is a variance among the members of this court, and not because of any other variance.

The judgment is therefore reversed, and the cause is remanded to the District Court of Weber County, with directions to grant a new trial and to permit either party to amend his pleadings, if so advised; appellant to recover costs.

STRAUP, C. J.

The plaintiff alleged the ground owned by it (76x301.65 feet) to be in lot 9, and the disputed strip (2.6 feet) to be in lot 8, adjoining it on the north. It alleged title to the strip on the theory of an agreed boundary line by acquiescence—that is, that the north line of the disputed strip for many years had, by the parties and their predecessors, been recognized and acquiesced in as the boundary line between their respective parcels, the plaintiff's to the south, and the defendant's to the north of that line. On that theory the court made findings and rendered a judgment in favor of the plaintiff awarding to it the strip in dispute. I concur with Mr. Justice FRICK that the findings in such respect are not supported by the evidence, and that the judgment, on this record, cannot be upheld on any such theory. To grant the plaintiff the ground on any other theory is to depart from the pleadings and to render a judgment without a pleading to support it. I thus concur in the reversal of the judgment.

I am, however, not satisfied that we, on the record, should direct a judgment for the defendant. He predicated his right and title to the disputed strip on an adverse holding. As stated by Mr. Justice FRICK, the trial court made no findings as to that issue. We thus do not know what view the trial court took of that, except as may be implied from the findings and judgment which were made and rendered, that it, without specific findings, held against the defendant on the issue of an adverse holding. We, no doubt on a review of the record, and with respect to such or any, issue, may ourselves make or direct findings, or remand the case for further proceedings. As stated by Mr. Justice FRICK, the evidence to support the defendant's title by an adverse holding is not strong. I think it weak and insufficient for this: The fendant's possession and occupancy or use of

the strip was not of such a character as was calculated to give the owner, or the world, notice of an adverse holding, and to enable the plaintiff, against whom it is claimed to have been exercised, to know about it, and to resist the acquisition of the right before the period of limitation had run. The strip in dispute was not inclosed nor cultivated nor improved by the defendant. His possession and occupancy consisted principally in this: (He cut a doorway in the south side of the shed which abutted the disputed strip on the north, and through which he took horses in and out of the shed, and threw manure from the shed, and left wagons stand partly on the strip and partly on uninclosed and unoccupied lands to the south of the strip) In such manner the defendant used not only the disputed strip, but also, and of necessity, so used additional, open, uninclosed, and unoccupied ground to the south of the strip, which additional ground confessedly belonged to the plaintiff, and admittedly was not acquired adversely or otherwise by the defendant. It is not uncommon for one neighbor to let vehicles stand on uninclosed and unoccupied ground of another, to lead or drive horses over it, and to throw manure and rubbish on it. All that may be a trespass or a nuisance; but it hardly is such a possession or occupancy as is calculated to give the owner notice of an adverse holding, and knowledge to him that, if he does not take steps to interrupt the occupancy, it will ripen into a title by limitation. The chief ground on which a disseisor acquires title by adverse possession is laches of the owner, his seeing his boundary and land invaded by an adverse claimant asserting title, and himself remaining passive and acquiescing in such adverse claim and assertion. Hence the general rule that the possession of an adverse claimant must be continuous, exclusive, open, hostile, notorious, and of such character as to enable the owner to know of the invasion of his rights. I do not think the defendant's possession or occupancy or use of the strip was of that character. Thus, on the evidence, the relevant evidence pertinent to the issues as presented by the pleadings— by the plaintiff an agreed boundary line by acquiescence, by the defendant an adverse holding—I think neither, as against the other, has shown enough to prevail. That the strip belongs

either to the plaintiff or to the defendant is clear enough. It does not belong to another. To hold that the plaintiff has not shown title, the only title alleged by it, is one thing; to hold that the defendant has title by an adverse holding is quite another and different thing. When a grant is decreed to one on an adverse holding, such award is made regardless of whether his adversary's title otherwise was perfect or imperfect, strong or weak; for an adverse holding, when established, operates as a bar, and conclusively presumes a grant from the rightful owner. True, the plaintiff, on the record, has not shown title as alleged by it. Neither, in my judgment, did the defendant. The case is one where both parties fail for want of proof. The judgment thus might be cast against him having the burden, and neither party could complain were that done. But, on the record, I am not satisfied that the question of whether the plaintiff or the defendant is entitled to the disputed ground is dependent upon the issues alone as presented, and not upon other issues, including that with respect to the location of the boundary line between lots 8 and 9. If both issues, as presented, fail, then, in detemining whether the disputed ground belongs to the plaintiff or to the defendant, the location of the boundary line between lots 8 and 9, considered in connection with the surplus ground in the block, is important, as well as whatever other source of title or right of possession either party may be able to bring forward.

I therefore think the judgment should be reversed, the case remanded and thrown at large, and either party given leave to amend if either be so advised.

McCARTY, J. (dissenting in part).

In his answer defendant alleges that he has acquired title to the ground in dispute by adverse possession, and it is the only source of title pleaded by him. I shall assume, however, for the purpose of this case, the defendant may, under the allegations of adverse possession, prove title derived from any source.

There is no substantial conflict in the evidence regarding the material facts in the case. The evidence shows that Ogden

City was first surveyed, the streets and blocks platted, in 1853. In 1869 another survey was made, and the streets and blocks again platted. It seems that this survey, like the first, failed to locate monuments, and was in other respects deficient and unsatisfactory. In 1884 W. Jenkins, a civil engineer, who had resided in Ogden all his life, and who was in a general way familiar with the map of the city, was employed by the city to survey the streets and blocks and establish monuments. What was done by Jenkins in that regard I shall refer to later. In the year 1870 certain parties who had acquired possessory rights to parcels of land in lots 7, 8, and 9, respectively, in block 25, received deeds for their respective holdings from the mayor of Ogden City, who, it seems, held the land in trust for the occupants and owners thereof. In cases where the mayor was the grantee the deeds were executed by the city recorder. The evidence without conflict shows that in describing the different parcels of land referred to in the record, the initial or starting point, with but one exception, was the northeast corner of block 25. In some cases this point is referred to as "the northeast corner of lot 7 in block 25." In the exception referred to the starting or initial point was the northwest corner of lot 7. These corners are definitely located by the record, and there is no controversy, neither is there any conflict or uncertainty, in the evidence respecting their location.

For the purpose of clearly illustrating the location of Ford's land and the distance from the north boundary line of lot 7 to the south boundary line of lot 8 in block 25, as these lines existed when the deeds were executed, I invite attention to the following diagram, which is a fac simile of the plat incorporated in the abstract of title of Ford's ground except the dotted lines, the letters at either end of the lines, and the figures indicating the length of the dotted lines, which do not appear on the plat in the abstract of title. This abstract of title was introduced in evidence by Ford.

"A part of lot eight (8), block twenty-five (25), plat A, Ogden City survey, beginning at a point 198 feet south and 10 rods and 6 feet west of the northeast corner of lot seven (7) of said block twenty-five (25), and running thence west

88 feet; thence south 66 feet; thence east 88 feet; thence north 66 feet to the place of beginning—subject, however, to a right of way over the east six (6) feet of said lands, situate in the S. E. ¼ of Sec. 29, Tp. 6 N., R. 1 W., S. L. Mer. U. S. survey.''

It is suggested that the abstract was offered by defendant for the purpose of showing how he ''deraigned title.'' Conceding that it was offered and received in evidence for that purpose only, it nevertheless, when so considered, shows that the land in dispute is not covered by or included in any of the conveyances therein mentioned; in fact, it completely disproves and overthrows the very claim sought to be established by it. It is also suggested in the prevailing opinion that I refer (further along in this dissenting opinion) to a certain blue print showing the boundaries of Ford's land with respect to adjoining properties, as fixed by his record title as having been offered in evidence by the defendant. This is error. What I do say is: ''The blue print was offered and received in evidence.'' No claim is made that the map is incorrect or misleading in any particular. I therefore thought when I prepared the first draft of this dissenting opinion (and still think) that it was immaterial which side introduced it in evidence. This map, or blue print, is referred to in the

prevailing opinion as "the official map." I fail to find a
scintilla of evidence in the record that even suggests that it
is an official map; in fact, I think the evidence clearly shows
to the contrary. The record shows that R. S. Corlew, a civil
engineer, was employed by Ford to survey the ground and
to make the map. Corlew was Ford's witness, and on cross-
examination testified in part as follows:

"Q. In May, 1913, you went down there and took some
measurements for Ford, didn't you? A. Yes, sir. Q. And
you made a map of it? A. Yes, sir. Q. And some blue
prints? A. Yes, sir. Q. Is this one of them? A. Yes, sir."

Later this blue print, Plaintiff's Exhibit B, was offered and
was received in evidence as a part of plaintiff's cross-exam-
ination of Corlew. Conceding, for the purpose of this case,
that the blue print, Exhibit B, was submitted to the author-
ities of Ogden City by Corlew (who was not even shown to
be an attaché of the city engineer's office or any other depart-
ment of the city government), and that it was accepted and
approved by them as the official map of Ogden City of lots
7, 8, and 9, block 25, these being the only lots designated and
traced on the map, it does not prove, or tend to prove, that
defendant is, or ever was, the owner or in possession of the
ground in dispute. Nor does it disprove, or tend to disprove,
any allegation of the complaint. But, like the abstract of title
herein referred to, it shows the south boundary of Ford's
land to be exactly where the south side or wall of the shed
was erected, and where the evidence without conflict shows
it has been maintained by Ford and his predecessors in inter-
est for approximately 33 years. The blue print is referred
to again further along in this dissenting opinion.

I shall now proceed to review the evidence and specifically
point out wherein it shows the title to the ground in question
to be in the plaintiff, and, as I view the record, the ground-
lessness of defendant's claim of title.

On November 9, 1870, Lorin Farr, as mayor of Ogden City,
conveyed by warranty deed to J. Browning part of lots 7
and 8 "beginning at the northwest corner of said lot 7, and
running thence east 5 rods; thence south 16 rods; thence west
5 rods; thence north 16 rods to the place of beginning. This

land is indicated on the diagram by the letters A and B. The dotted line represents the east boundary of this piece of land. On November 18, 1870, Thomas G. Odell, as recorder of Ogden City, conveyed by warranty deed to Lorin Farr parts of lots 7 and 8 "commencing 10 rods west of the northeast corner of said lot 7, and running thence west 5 rods; thence south 16 rods; thence east 5 rods; thence north 16 rods to the place of beginning." The dotted line between the letters C and D indicates the east boundary of this piece of ground. The record also shows that transfers by deed were made in 1870 of parcels of land in lots 7 and 8, other than those mentioned and that each piece of ground so conveyed extended from the north line of lot 7 south just 16 rods—264 feet—to the then south boundary line of lot 8. On June 4, 1870, Farr, as mayor of Ogden City, conveyed by warranty deed to David H. Peery a portion of lot 9 in block 25 "commencing at the northeast corner of lot 9, and running thence south 76 feet; thence west 330 feet; thence north 76 feet; thence east 330 feet to the place of beginning." The undisputed evidence shows that the then northeast corner of lot 9 was just 16 rods (264 feet) south from the northeast corner of block 25. The dotted lines from F to G and from G to H on lot 9, as sketched on the foregoing diagram, indicate the south and west boundary lines of this parcel of ground. It is admitted that this piece of ground "by mesne conveyances is now owned by the plaintiff," respondent herein. The evidence without conflict shows that when this deed was executed the width of each of the lots 7 and 8, north and south, was 132 feet only. The distance, therefore, from the north boundary line of lot 7 to the south boundary line of lot 8 was exactly 264 feet. It follows, therefore, that the ground in dispute is covered by and included in the deed from Farr, as mayor, to Peery. This is, or should be, decisive of this case unless the defendant has proved title by adverse possession.

During the 30 years intervening between the time of the first survey was made in 1853 and the Jenkins survey of 1884 large buildings, business blocks, were erected on lots 7, 8, and 9 in block 25. Some of these structures faced east on Washington Avenue, and others faced north on Twenty-fourth

Street.  One of these buildings, known as the Armstrong Block, was erected on the southeast corner of lot 8, and another, known as the Peery Block, was erected on the then northeast corner of lot 9.  The south side of the south wall of the Armstrong Block and the north side of the north wall of the Peery Block are contiguous, and each is just 264 feet south from the northeast corner of lot 7, and extend west from Washington Avenue about 160 feet in a direct line of the south side or wall of the shed mentioned, and to within about 12 feet of the southeast corner of Ford's land.  The unimproved portion of the ground immediately west of the Peery Building was therefore in the actual possession of the owners of the building, as much so as the back yard of a residence is in the possession of the owner and occupant of the residence.  On March 9, 1874, 10 years before Jenkins surveyed and platted the streets and blocks of Ogden City, Farr conveyed by warranty deed to William Jennings and William H. Hooper a part of lots 7 and 8 in block 25.  The ground upon which the shed hereinafter referred to was later erected is a part of the land included in and conveyed by this conveyance.  The calls in the deed, as shown by the abstract of title introduced in evidence by Ford, locate the south line or boundary of the land exactly 16 rods (264 feet) south of the north line of lot 7.  On January 9, 1877, Jennings and Hooper reconveyed the land last mentioned to Farr.  The calls of this deed and the deed above mentioned are identical. No part of the strip of ground (2.2 feet in width) in controversy was included in or covered by either of the deeds.  About the year 1879 three of Farr's sons went into possession of the property above mentioned as his tenants.  One of the sons, Ezra Farr, was a witness in the case, and testified in part as follows:

"We put the shed up there; we drew a line there and thought that would be on our ground.  The posts were set. the post holes were dug 2 or 2½ feet.  The shed was built. The outside of the south side of the shed was board; the roof iron.  It was a fence put up of wood posts and wiring and boards.  Did not occupy anything south of the south line of that shed."

It seems that in the prevailing opinion much weight is given to the testimony of Ezra Farr, wherein he says that when he and his brothers erected the south side of the shed they "were not particular as to the line," because the shed was only a temporary structure. I think it is wholly immaterial whether they used the utmost care to place the south side of the shed on the boundary line or were careless and indifferent in that regard. The fact is that the fence or shed was erected on the boundary line as fixed by the calls in the grantee's deed, and has been maintained there for approximately 33 years. On January 3, 1883, Farr conveyed by warranty deed to Corey Brothers the land described in the deeds of conveyance last mentioned. The calls of the deed are, so far as material here, as follows:

"Commencing 10 rods and 6 feet west of the northeast corner of said lot 7, and running thence west 50 feet; thence south 12 rods; thence west 38 feet; thence south 4 rods; thence east 5 rods and 6 feet; thence north 16 rods to the place of beginning."

The next to the last call, namely, running "thence east 5 rods and 6 feet" (88 feet), represents, as indicated on the foregoing diagram, the south line or boundary of the land conveyed. A. B. Corey, one of the grantees named in the last mentioned deed, was called as a witness, and testified in part as follows:

"I know the premises in dispute. I remember the shed: * * * It was there when we went there, probably 1883. * * * We never used the premises south of the south wall of the shed. That wasn't supposed to be ours. We were fenced off from using anything, and didn't have occasion to particularly. We didn't claim any land south of the shed. I understood that David H. Peery was the adjoining owner on the south."

In 1886 and 1887 George L. Corey, a member of the firm of Corey Brothers, purchased from the other members of the firm their interests in the land mentioned. The calls in the deeds by which these interests were conveyed to him locate the south boundary line of the land exactly in the place where the calls of the deed from Farr to Corey Brothers located

and fixed it, namely, where the south side or wall of the shed stands. On July 20, 1899, approximately 16 years and 6 months after the land upon which the shed stands was conveyed to Corey Brothers, and approximately 20 years after the shed was erected, George L. Corey, by warranty deed conveyed the land to Ford. The calls of the deed describing and fixing the boundary of the land are as follows:

"Beginning 10 rods and 6 feet west and 198 feet south of the northeast corner of lot 7 in block 25, and running thence west 88 feet; thence south 66 feet; thence east 88 feet; thence north 66 feet to the place of beginning."

The letter X in lot 8 of the foregoing diagram indicates the land above described. The calls in the deed correspond exactly with the plat attached to and made a part of the abstract of title. The figures on the plat which is incorporated in and made a part of the abstract of title and the figures on the foregoing diagram are taken from, and correspond with, the calls of the deed from Corey to Ford. Ford testified that immediately after he took possession of the land he improved the south wall of the shed, which was out of repair, and that in 1902 he erected a brick building on the ground just north of the shed. On May 9, 1913, Ford had the ground he purchased from Corey surveyed by R. S. Corlew, a civil engineer. The engineer made a "blue print" showing the area of land and its location in lot 8 with reference to the adjoining properties. This is the blue print referred to in the prevailing opinion as "the official map." Corlew was called as a witness by Ford, and testified in part as follows:

"In making my survey I began at the monument of the intersection of Washington avenue and Twenty-fourth street."

This monument, as the record shows, was established by Jenkins in 1884. The blue print was offered and received in evidence, and reads:

"Survey of part lot 8, block 25, plat A, beginning 10 rods and 6 feet west and 198 feet south from the northeast corner of lot 7; thence west 88 feet; thence south 66 feet; thence east 88 feet; thence north 66 feet to beginning."

This part of the blue print, "the official map," is not set forth in the prevailing opinion. Corlew further testified:

"Following that measurement, the south property line of Ford's premises was practically contiguous with the south line of the shed. Measuring 198 feet south of the line which is supposed to be the south side of Twenty-fourth street, and then measuring 66 feet, I come to the south side of the shed."

Corey did not convey, nor is there any claim that he attempted or intended to convey, to Ford the strip of ground in dispute. The evidence without conflict shows that from about the year 1879 to and including July 20, 1899, approximately twenty years, neither of Ford's predecessors in interest was in actual or constructive possession of the strip of ground in controversy or any part of it. Nor did any of them, at any time, or on any occasion, so far as this record discloses, claim any interest in or assert any right or title to any of the ground south of the shed. While Corey Brothers owned and were in possession of the land they recognized and accepted the south side or wall of the shed as the south line or boundary of their ground. A. B. Corey, referring to the land described in the deed from Farr to Corey Brothers and in the deed from George L. Corey to Ford, testified that the ground was "fenced off" by the south side of the shed from the land adjoining it on the south. And, as I have stated, Corey further testified that they (Corey Brothers) "never used the premises south of the shed"; that the land lying south of the shed "wasn't supposed" to be their property; that he "understood" Mr. Peery owned the land south of and contiguous to the shed. At the time Ford purchased the property the south side or wall of the shed had been recognized and accepted by his predecessors in interest, the Coreys, as the boundary line between the land conveyed to him and the ground south of and contiguous to the shed. Ford therefore cannot, under the doctrine of *Holmes* v. *Judge,* 31 Utah, 269, 87 Pac. 1009; *Young* v. *Hyland,* 37 Utah, 229, 108 Pac. 1124; *Rydalch* v. *Anderson,* 37 Utah, 99, 107 Pac. 25; *Binford* v. *Eccles,* 41 Utah, 453, 126 Pac. 333; *Christensen* v. *Beutler,* 42 Utah, 392, 131 Pac. 666, and *Tanner* v. *Stratton,* 44 Utah, 253, 139 Pac. 940, be heard to deny that the boundary line thus recognized and accepted is the true one. This is not a case where a grantee, after he takes possession of the land conveyed to him, dis-

covers that one of the end or side lines of his land as indicated by fences or other improvements is not where it is located and described in his deed of conveyance. On the contrary, it is a case where the boundary line in dispute is marked and established by the improvements identically where the calls of the grantee's deed locate and describe it to be.

There are five lots in block 25 abutting on Washington Avenue. The deeds of conveyance forming the chain of title to the land purchased by Ford and the plat in the abstract of title of Ford's property, the blue print referred to in the prevailing opinion as "the official map," as well as the calls in the deeds from Farr to various parties of other parcels of land in lots 7 and 8, referred to and described in the abstract of title mentioned, show conclusively that from 1853 to the time Ford, in 1913, attempted to take possession of the strip of ground in question (approximately 60 years), the boundary lines of the different pieces of property so conveyed were established and have been maintained on the theory that each of these lots (7 and 8) has a frontage on Washington Avenue of 132 feet only. It is apparent that when block 25 was first surveyed and platted, and when the mayor of Ogden City in 1870 conveyed parcels of land in lots 7, 8, and 9 to the occupants and owners thereof, the area of this block was supposed to be 40 rods by 40 rods, and, as I have stated, each of the lots, 7 and 8, had a frontage on Washington Avenue 132 feet only. It seems, however, that when Jenkins surveyed and platted block 25 in 1884 it was discovered that it had a frontage on Washington Avenue of 40 rods and 7 feet. This was approximately 4 years after the deed from the mayor of Ogden City to Peery, was executed and after large business blocks had been erected on lots 8 and 9, in accordance with the boundary lines theretofore established. Whether this 7 feet of surplus land, so-called, was created by an error or mistake in making the first survey in 1853, or in the survey of 1869, or whether it was created by parties owning land in block 25 that faced and abutted on Twenty-fifth Street, encroaching upon the street to that extent, the record does not disclose, nor is it, in view of the admitted facts, important.

Jenkins, who, as stated, made an official survey of Ogden

City in 1884 and platted the streets and blocks, in his testimony, referring to the lots in block 25 abutting on Washington Avenue, said:

"They (the lots) are supposed to be equal. They are platted as being equal with the supposed frontage of 132 feet. Block 25 fronting on Washington Avenue is more than five times 132 feet—more than 40 rods—and I have distributed that (the surplus) equally among the lots."

But, as I have pointed out, when Jenkins thus undertook to arbitrarily change the established boundaries of the several pieces of property in lots 7 and 8, the Armstrong and Peery Blocks had been constructed. And the record also shows that at that time business buildings had been erected on lot 7 fronting on Twenty-Fourth street on property purchased by the owners on the theory that lots 7 and 8 extended south 264 feet only. The record title of these properties shows this. No changes were made in the boundary lines of lots 7, 8 and 9, so far as the record discloses, until Ford asserted that the land in dispute belonged to him. As I view the record, all that can be said in support of Ford's theory of the case is that, while each of the lots, 7 and 8, has an actual frontage on Washington avenue of 132 feet only, each lot nevertheless has a frontage on paper of approximately 133.5 feet.

In 2 Devlin on Real Estate, 1032a, the author says:

"When the platter of town lots has set stakes, purchasers may locate their lines accordingly, and such lines cannot be unsettled by a subsequent survey. Notwithstanding errors in locating them, they must control, and the question is not whether they were correctly placed, but whether they were platted by authority, and, relying on them, persons have purchased lots and taken possession." *Le Compte* v. *Lueders*, 90 Mich. 495, 51 N. W. 542, 30 Am. St. Rep. 450.

And again, in section 1032:

"If a survey is subsequently made which changes the location of a larger tract with which, according to the language of the deed, the land conveyed was located, or if the subsequent survey restricts the area of such tract, the title of the grantee is not divested nor his right impaired. *Widbur* v. *Washburn*, 47 Cal. 67.

Attention is invited to the decree of distribution in the matter of the estate of David H. Peery, deceased, admitted in evi-

dence, wherein the piece of ground in dispute was distributed to the devisees under the will of said Peery and described as being in lot 8, block 25. Reference is also made to the fact that the land is described in the pleadings as being in lot 8. Keeping in mind that when Jenkins surveyed and replatted block 25 in 1884, he, by distributing the so-called surplus land in the block and adding to each lot its pro rata of the excess of ground, increased the width, north and south, of each of the lots 7 and 8 (on the official plat) 1.5 feet. I think it is evident that the decree of distribution of the land in dispute was had merely as a matter of precaution to protect the interests of the devisees under the will of said Perry in the event that the arbitrary act of Jenkins in changing the recognized and accepted boundary lines of the lots mentioned should be judicially approved and upheld. As I view the case, the decree of distribution has no material bearing on the issues involved. Nor do I think, under the circumstances, the mere fact that the land is described in the pleadings as being in lot 8 is decisive of the case. The south line of Ford's land is described in the chain of title which Ford put in evidence as being 171 feet west from the northeast corner of block 25 (which point is not in dispute), and 264 feet south from the north boundary line of lot 7, which point is also recognized and established. Nowhere in the chain of title is the land in dispute mentioned, nor is it included in any of the conveyances which constitute the chain of title to Ford's land. The pleader, looking to the official plat made by Jenkins in 1884, might well allege that the land is in lot 8. And I think it is plain that the strip is referred to in the pleadings as being in lot 8, because it so appears in the plat in which Jenkins, as stated, arbitrarily changed—moved south—the theretofore, as I view the case, recognized and accepted line between lots 8 and 9. There is, however, no uncertainty either in the pleadings or in the evidence respecting the exact location of the land in block 25 or the actual, physical boundary line between lots 8 and 9. It is alleged in the complaint:

"That when said lot No. 9 in said block and plat was platted by said Ogden City, the corners and exterior limits thereof

were not definitely marked on the land as land platted as aforesaid; that thereafter plaintiff and defendant, and their predecessors in interest, as well as other owners of the land in said lot, determined and located upon said lands the boundary lines of said lot, and also the lands of plaintiff, and erected upon said boundary line, determined as aforesaid, buildings and other structures in conformity with the determination of said last-mentioned boundary line, bounding said surplus on the north side thereof, and plaintiff and defendant and their said predecessors in interest, together with the other owners of the land adjoining the above-described land on the north and on the south of said last-mentioned boundary line, then and there determined said boundary line, and well and truly defined the same upon the ground by the erection of buildings and structures in conformity with said lines, which said determination has been acquiesced in by plaintiff and its predecessors in interest and the owners of lands adjoining plaintiff's said land on the north side thereof, as above described, for more than 20 years last past; that the defendant now disputes said northern boundary line of plaintiff's land, and against its will and without its consent has begun excavations upon said last-mentioned tract for the purpose of erecting a building upon plaintiff's said land, and extending about 2 feet and 6 inches south from said last mentioned, established and recognized boundary line on the north side of said lands.''

Assuming, but not conceding, that there is a fatal variance between the proof and the allegations of the complaint as to the exact location of the land in question, I submit that equity demands that the cause be remanded to the trial court, with directions to permit plaintiff to amend its complaint to conform to the facts proved, and to modify the judgment accordingly or to grant a new trial. I think it is clear that, if plaintiff, in describing the land in controversy, had used the northeast corner of lot 7, block 25, as the initial or starting point, and then proceeded to locate the land without referring to either lot 8 or lot 9 by name, there would be absolutely no merit to this appeal. Ford introduced in evidence a number of tax receipts for taxes paid by him on his property in lot 8. These receipts show that he was assessed for a strip of ground

88 feet in length by 2.2 feet in width in excess of what his deed calls for. He testified that he did not know how he "happened" to be so assessed. He also testified that he claimed to be the owner of the ground in controversy; but, on being asked to whom he made his claim, he answered: "I didn't make it to anybody." Ford's alleged possession of the strip of ground consisted in driving his horses into and out of his stables through a door that he cut in the south wall of the shed, piling manure and debris from his stables on the ground south of the shed, and by standing his wagons thereon when not in use. I do not think it will be seriously contended that the use Ford made of the land south of the shed, even when coupled with the payment of the taxes on more land than his deed calls for, vested in him the title to the ground in controversy. If these transactions are held to be sufficient to enable Ford to take and hold the property as his own, then the law recognizes a novel and easy method by which a party may clandestinely confiscate and appropriate to himself his neighbor's property.

Since the foregoing was written the Chief Justice has also written an opinion in which he favors a remanding of the case, with directions to the lower court to grant a new trial and to permit the parties to amend their pleadings, should they so desire. Without changing or in any way modifying anything contained in this opinion, I fully concur with the Chief Justice in remanding the case for a new trial, with the directions suggested.